ANDREW A. MOORE et al. v. BOARD OF RE-GENTS FOR THE NORMAL SCHOOL IN DIS-TRICT NUMBER TWO, Appellant.

Division Two, January 4, 1909.

1. **CONTRACTOR: Quantum Meruit: Proper Revocation of Contract: Recovery.** The contractor, whose contract for the construction of a building has been rightfully terminated by the owner of the land, is entitled to recover the actual value of the materials furnished and labor and work done appropriated by the owner, less any damages suffered by the owner by reason of the contractor's failure to comply with the contract.

2. ———: ———: **Arbitrary Revocation of Contract: Recovery: Damages.** If the owner of the land wrongfully and arbitrarily refused to permit the contractor to carry out his construction contract and complete the building, the contractor is entitled to recover the actual value of the work done and material furnished by him and appropriated by the owner of the land, without any diminution by way of damages suffered by the owner because of the contractor's failure to complete the contract according to its terms. In such case, whatever damages ensued to the owner is the result of his own wrongful act.

3. **INSTRUCTIONS: Adopted by Defendant.** Where defendant adopted the plaintiff's theory of the law of the case as declared in plaintiff's given instruction, by asking a similar instruction given by the court, defendant cannot on appeal be heard to complain of plaintiff's instruction.

4. **CONTRACTOR: Qauntum Meruit: Excessive Verdict.** Where the contractor, when he was ordered to stop work under his contract, called in an expert contractor and builder, who made an itemized statement of all the materials furnished and labor done, and their statement was before the jury and they were examined upon it, and the statement made by the owner of the land was not itemized and his evidence was otherwise unsatisfactory, there is nothing which would authorize the appel-

215 Sup—45

late court to hold that a verdict within the limits of the petition, rendered under proper instructions, was excessive, or the result of passion, prejudice or obvious mistake.

5. ————: ————: **Termination of Contract: Fraud: Pleading.** Where the contractor in his reply pleaded that the architect wrongfully, wilfully and without any cause condemned and rejected the materials furnished, and defendant accepted this as a sufficient plea that the contract had been arbitrarily terminated, he will not be heard to further contend that under the contract the opinion of this architect was final in the absence of fraud, and there is no charge of fraud in the reply.

6. ————: ————: ————: **Penalty of $20 Per Day.** A provision in the builder's contract that he should pay the owner of the land twenty dollars per day from the time fixed for the completion of the work until its actual completion, does not authorize the court to decrease the amount the builder is entitled to recover by that twenty dollars, when, upon a wrongful termination of the contract, he sues for the value of the materials furnished and work done appropriated by the owner, if the clause of the contract relating to its termination does not call for the penalty; and a clause binding the builder "to make good all reasonable expenses, charges, damages and cost of litigation" in case of termination of the contract, does not call for such penalty. Without such a clause the penalty can be allowed to the owner only on condition that the builder completed the work but failed to complete it in time

## Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis*, Judge.

A<small>FFIRMED</small>.

*J. W. Suddath* and *William Aull* for appellant.

(1)   A contractor working under a contract providing that he is to be paid only on the completion of the work, and, if he quits, the owner may complete building at the contractor's cost and recover all excess, if any, off of the contractor, may nevertheless, upon termination of the contract, either by himself or the owner, sue in *quantum meruit* or *quantum valebat* for the amount of work done and material furnished before the work is completed, and can recover the actual value of his work and materials upon the schedule

of prices named in the contract, less any damages he may have caused the owner by the violation of the contract. Williams v. Railroad, 112 Mo. 498; Yeats v. Ballentine, 56 Mo. 530; St. Francois Co. v. Marks, 14 Mo. 379; Lamb v. Brolaski, 38 Mo. 53; Haysler v. Owens, 61 Mo. 270; Marsh v. Richards, 29 Mo. 105; Fleischmann v. Miller, 38 Mo. App. 177; Gregg v. Dunn, 38 Mo. App. 283; Globe L. & H. Co. v. Doud, 47 Mo. App. 439; Linnenkohl v. Winkelmeyer, 54 Mo. App. 570; Heman v. Improvement Co., 58 Mo. App. 480; Bassett v. Sanburn, 63 Mass. 58; Hay v. Bush, 34 So. 692; Mueller v. Gillick, 66 Mo. App. 500; Aetna I. & S. Works v. Kossuth Co., 44 N. W. 215. (2) The opinion of the architect as to the character or kind of work or material, if provided for in the contract, is absolute and final, except when guilty of fraud, and the burden is on the party charging fraud to prove it. Williams v. Railroad, 112 Mo. 488; McCormack v. St. Louis, 166 Mo. 339; Board of Education v. National Surety Co., 183 Mo. 183; McGregor v. Construction Co., 188 Mo. 623; Snoqualine Realty Co. v. Moynihan, 179 Mo. 648. (3) The penalties incurred by a contractor for non-performance may be set up against his claim on *quantum meruit.* Marshall v. Hamm, 2 Harr. (N. J.) 425; Ramlose v. Dollamn, 100 Mo. App. 347; 22 Ency. Pl. & Pr., 1382; Malone v. Philadelphia, 147 Pa. St. 46. (4) If damages done by failing to comply with the contract exceed the value of the labor done and material furnished, defendant may recover excess. Clapper v. Mendell, 96 Mo. App. 40; Flieschman v. Miller, 38 Mo. App. 177. (5) When the cause of delay is removed, the contractor must use reasonable diligence to complete the work under the contract. And if he does not do so, he is liable for damages and in this case is liable to have his employment terminated. 30 Am. and Eng. Ency. Law (2 Ed.), 1256; McGown v. Co., 121 U. S. 575; Granson v. Tober, 75 Ill. 540; Darmat v. Fuller, 120 N. Y. 554; Pittsburg Co.

v. Natl. Tub. Work Co., 184 Pa. St. 251; Interocean
Co. v. Sheriffs, 54 Wis. 202. And this is so regardless
of the alleged delay by strike, weather and architect.
30 Am. and Eng. Ency. Law (2 Ed.), 1257. (6) When
a contractor undertakes to do certain work (as the
erection of a building) within a limited period, the
exercise of proper prudence on his part requires that
the work be begun within such a reasonable time after
the execution of the contract as will enable him to
finish it within the time limit, notwithstanding unusual,
heavy, or constant rains; and when it is shown in such
a case that the contractor delayed the beginning of the
work to a period after which he could only have finished
within the time had the season been an ordinary one,
it was held to be error on the part of the trial judge
to charge the jury, in effect, that if the contractor com-
menced the work at a period which would have enabled
him to finish it within the time limit under ordinary
conditions but was thereafter prevented from com-
pleting it in the given time, because of the unusual,
heavy and constant rains, such causes would be a suf-
ficient excuse for a failure to construct the building
within the time limit. Cannon v. Hunt, 113 Ga. 501.

*O. L. Houts* for respondents.

(1) The verdict was not excessive. It is only
where the amount awarded exceeds the aggregate of
items testified to by the witnesses, that the verdict is
excessive. Badgley v. St. Louis, 149 Mo. 122. (2)
There was no error in the instructions given. The
court did not undertake to cover the entire case in
a single instruction, but by a series of instructions sub-
mitted the issues of fact in the case to the jury. In
one of the series the jury were instructed to consider
the instructions "all together and not as separate or
distinct statements of the law for or against either
plaintiffs or defendants." In the absence of that in-
struction this court would have assumed that the in-

structions were considered together by the jury. Considered as a whole the instructions were far more favorable to defendants than they had a right to ask. Lange v. Railroad, 208 Mo. 475; Cornovski v. Railroad, 207 Mo. 278; Johnson v. Railroad, 203 Mo. 415; Deschner v. Railroad, 200 Mo. 332; Lee v. Railroad, 195 Mo. 428; Norton v. Kramer, 180 Mo. 544; Dewiese v. Mining Co., 128 Mo. 426, affirming same case reported in 54 Mo. App. 476; Buchman v. Railroad, 100 Mo. App. 30.

GANTT, P. J.—Plaintiffs sued on a *quantum meruit* for the reasonable value of labor performed and material furnished.

The petition states in substance that on the 14th day of November, 1903, defendants entered into a written contract with plaintiffs for the erection by plaintiffs of what is known as the gymnasium building at Warrensburg, Missouri, and to be used in connection with the State Normal School for Normal School District No. 2; that in pursuance of the contract plaintiffs entered upon the construction of the building and had constructed a portion thereof, when, on the 16th day of September, 1904, defendant wrongfully declared said contract at an end and prevented plaintiffs from completing the building; that on and prior to said date plaintiffs had performed work and furnished material in the construction of said building, and had delivered upon the premises, for the purposes of being used in said building, material of the reasonable value of $22,086.95; that plaintiffs had received of defendants $9,008, leaving a balance due and unpaid of $13,078.95, for which, with costs, plaintiffs asked judgment.

Defendant for amended answer to the petition admitted that the plaintiffs were partners as alleged in the petition, doing business under the firm name of Moore Brothers; denied that defendant wrongfully

terminated the contract; denied that the labor performed and material furnished by plaintiffs were of the reasonable value of $22,086.95, and admitted the payment of $9,008. The answer then denied all the other allegations of the petition not specifically admitted. The answer then set up the contract, pleading specifically article 8 of the contract, providing that in case of the failure of the plaintiffs to complete the building within the time limited in the contract they should pay to defendant $20 a day for each week day intervening after said date until the completion of the work, "provided they are not delayed by strikes, accidents, the unusual action of the elements or other unavoidable circumstances;" article 4, providing that, in case of the failure of the plaintiffs to proceed with the work and furnish proper labor and material, the architect or board should, on giving ten days' written notice, have the right to terminate the contract, take possession and complete the building, and that the plaintiffs should make good to the board for the plaintiffs' failure, including all reasonable expenses, charges, damages and costs of litigation; and article 7, providing that plaintiffs should receive $47,400 for the completion of the building. The answer then set up that plaintiffs did not make proper progress with the erection of the building as required by the contract, and stated that defendant on giving plaintiffs notice on the 16th day of September, 1904, terminated the contract, took possession of the building and material on the ground, and proceeded to complete the building. The answer then stated that defendant had and would consume 313 days in the completion of the building and asked to have set off against plaintiffs' claim a penalty of $20 for each of said days, amounting in the aggregate to $6,260. Defendants stated in the answer that they had already expended in the work of completing the building $32,181.65, and that they expected to and would expend the further sum of

$20,087.90, making a total expenditure of $61,277.73, in the completion of the building, and $13,887.73 in excess of the contract price, which defendants also asked to have set off against plaintiffs' demand. Defendants further alleged that they had expended and proposed to expend in the way of litigation in connection with the construction of the building the sum of $3,250, which sum they also asked to have set off against plaintiffs' demand. Defendants alleged that the aggregate of these various sums amounted to $23,387.73, for all of which they prayed judgment against the plaintiffs.

It was not alleged in the answer that the labor performed and material used in the construction of the building by plaintiffs up to the time defendant terminated the contract were not in compliance with the contract. The answer did not ask to recover back any portion of the money already paid by defendant to plaintiffs. It did not allege that the architect McDonald or the Board condemned any material furnished by plaintiffs for the construction of the building. The answer is voluminous and covers forty-eight printed pages.

Plaintiffs in their reply admitted the execution of the contract set out in the answer; that plaintiffs commenced the erection of the building under the contract and that on the 16th day of September, 1904, defendants stopped plaintiffs from working on the building and took possession. Plaintiffs then alleged that they would have completed the building according to the terms of the contract, but that they were prevented from doing so by "the wrongful acts, conduct, omissions and neglect of the defendant's agent, superintendent and architect, George E. McDonald, together with the weather conditions existing during the greater portion of the time after the plaintiffs entered upon the construction of said building and until the said 16th day of September, 1904." The reply then further alleges that the superintendent McDonald wrongfully

and wilfully prevented plaintiffs from proceeding with the construction of the building until the spring of 1904, thereby causing much delay, and that he further wrongfully and wilfully and without cause condemned and rejected stone furnished by plaintiffs for the erection of the building, causing additional delay. The reply further stated that plaintiffs were delayed in the erection of the building because of the unusual action of the elements, that there was an unusual amount of rainfall, and by reason of a strike of the employees of the plaintiffs.

Plaintiffs under the last provision of article 8 of the contract were not responsible for delays caused by strikes, accident and the unusual action of the elements and other unavoidable circumstances.

The record in this case covers 685 pages.

The evidence showed that plaintiffs resided in Kansas City, Missouri, were contractors and builders in good standing, had engaged extensively in that business for many years and that A. A. Moore had charge of the construction of the building.

Plaintiffs introduced photographs showing the structure as it stood on September 16, 1904, at the time the defendants put plaintiffs off and took possession of the work. The first photograph showed the west side of the building; the second the east, the third the north, and the fourth the south side. The fifth picture showed the interior and the brick partition walls which extended to the floor joists, as high as they were built. As appears from the photographs the first or basement story of the building was constructed and some of the joists were laid on that floor, the brick partition walls were practically finished and practically all of the window caps were on. Plaintiffs introduced an itemized statement of the labor performed and of the material furnished by plaintiffs up to the time the contract was terminated and possession taken by defendants. After setting out

the items the statement showed that plaintiffs then had material on the premises ready to be put into the building aggregating $4,467.30, and labor and material in the building aggregating $17,619.65, amounting in all to $22,086.95, which left a balance due plaintiffs of $13,078.95, the amount sued for, after deducting the payment of $9,008. This statement was made on or about the time the contract was terminated, by James A. Moore, member of the firm, Dan M. Hout, plaintiffs' foreman, and Frank H. Latimer, an experienced contractor and builder of Kansas City, all of whom including Mr. A. A. Moore testified that the itemized statement was correct, except that Mr. Latimer placed the total of the balance due at some twelve or fifteen hundred dollars less than that shown by the statement and the estimates of the other three witnesses.

Mr. Latimer stated that he was a contractor and builder, lived in Kansas City and was engaged principally in making estimates of material and labor necessary for the construction of buildings. He stated that at the request of A. A. Moore, one of the plaintiffs, about the time defendants took possession of the building he made an inventory of the labor performed and material furnished by plaintiffs in the construction of the building, produced the original inventory and estimates, and stated that the estimate in gross of the labor and material in the building amounted to $17,705.07 and that the material on the ground ready to be used in construction amounted to $3,076.40; that Mr. Moore, referring to A. A. Moore, foreman, and Mr. Moore's son assisted him in making the inventory and it was carefully and correctly made. He stated that the building had reached what is termed the first or basement story and that some of the joists were on and the brick partitions were practically all in. He was shown the itemized statement before referred to and stated that it was correct and practically the same as his own, except that his estimates aggregated

some two thousand dollars less than that shown in the itemized statement. On cross-examination Mr. Latimer was taken over the whole ground and showed by items how his estimates had been made and how he arrived at his totals and aggregates. This itemized statement was exhibited to Mr. A. A. Moore while on the stand. He stated that while he did not assist in making the inventory, from his knowledge of the facts he knew that the statement was correct. He testified that at the time defendants terminated the contract two-thirds of the outside walls of the building were up to the belt course above the first story windows and the caps were set. He also stated that the interior walls were ready to receive the second floor joists, with the exception of one wall probably thirty feet long, that lacked about three feet of brick work to carry it up to the height. He stated also that these brick walls did not go higher than the first story. He testified these brick walls were practically built, that there were two of them running the full length of the building, and besides there were two walls built of brick for the bowling alley in the basement.

James A. Moore, a member of the firm, stated that he in connection with Mr. Latimer and Mr. Hout after defendants took possession of the building made the inventory and that he afterwards copied it and extended the prices as shown in the itemized statement, and that the statement was correct, together with the aggregates. He produced the original statement made by him and said it corresponded with the statement introduced in evidence, except that all the prices had not been extended on the original. He further stated that there had been no work on the job by the defendants at the time he made this inventory.

Mr. Dan M. Hout testified that he had been a contractor and builder for thirty-five years and was employed by the plaintiffs to look after the construction of the building. He stated that he was on the

ground when Mr. McDonald came and took possession of the building, and that he afterwords, on the 13th day of October, he thought, assisted Mr. Latimer and Mr. James A. Moore in making the inventory of the material furnished and the labor performed as shown in the itemized statement introduced in evidence. He said he made the measurements and that they were correct. He said further that he had examined this itemized account, prices and estimates and that they were correct. The account follows his testimony.

The witness Mr. Latimer, having stated how the prices were fixed and the estimates arrived at, referring to each item of plaintiff's account, the witnesses A. A. Moore, James Moore and Hout were not asked either by plaintiffs or by defendants to go over the ground again. They testified to the correctness of the items and that the aggregates and balance as shown in the account and claimed by the plaintiffs were correct.

Plaintiffs' testimony tended to show that they were not to blame for any delays that occurred in the construction of the building. Article 8 of the contract provided that plaintiffs should commence work immediately upon the building or within one week from the date of the approval of their bond and cause a steady progress of the same until its completion. Plaintiffs' testimony tended to show that it was practicable to do so, and that the winter weather following the execution of the contract would not have interfered with that work. Mr. Latimer testified that it would have been practicable to have commenced the construction of the building on the first of December, 1903, and to have proceeded continuously. And the testimony of Hout and Forrester was to the same effect. Moore testified that while he could not get any of the cut stone for the construction of the walls of the building, he could obtain all of the other material necessary to proceed with the construction of the

building up to the point where the cut stone was needed; that he took steps to get such material and to commence immediately the construction of the building, told George E. McDonald, defendants' superintendent, his plans, and McDonald ordered him not to proceed with the construction and prevented him from doing so until the spring following. In this he was corroborated by the testimony of James A. Moore, who testified that McDonald said to him: "Q. Did you talk to McDonald about it? A. Yes, sir. Q. What did he say? A. He said we had plenty of time, we didn't have to get along with the building this winter, 'we will get at it next spring.'" That by the action of the architect McDonald, in ordering plaintiffs not to commence the construction of the building in the fall of 1903, they were delayed and unable to do anything in the way of construction until the spring of 1904. During the winter months, and subsequently, plaintiffs purchased and made contracts for material sufficient for the completion of the entire building, contracting with Pickle Bros. for the sawed stone for the facing, superstructure and the rubble stone.

When the spring came, commencing with March and continuing up till September, there was an unusual rain fall, which caused another delay despite anything plaintiffs could do. The fact that they had not been permitted by the architect to lay the foundation and put in the concrete during the winter and before the rains came made their work much more difficult during the rainy season. He testified that it was the most unusual spring he had ever seen, and that he had lived in Missouri for more than forty years. Aubry F. Smithson testified that he kept a record of the precipitation in Warrensburg during the spring of 1904, commencing with April. He testified to the number of days that rain fell, commencing on April 21st, and ending with August; that the total rain fall in Warrensburg during that time was 34.56 inches. Other

witnesses testified that there was an unusual rain fall in the spring of 1904. Mr. Hout, plaintiffs' foreman, testified that the spring was a very wet one, that the excavations and ditches filled with water and caved in and that it was very difficult to proceed with work.

On the 27th day of April plaintiffs received of Pickle Bros. three wagon loads of sawed or cut stone. That stone had not been delivered earlier because it could not be quarried in the winter or in the early spring owing to the wet season. The evidence showed that plaintiffs, in order to get the stone from the Pickles as soon as possible, had gone on a note of the Pickles to enable them to raise money to quarry the stone. On the arrival of the stone, April 27th, defendants' superintendent, McDonald, promptly condemned every foot of it. The Pickles refused to furnish more, all of which caused another delay. There were two quarries, one called the Pickle quarry and the other called the Forrester quarry, each situated about two miles from Warrensburg. Defendants' superintendent, McDonald, then went to the Forrester quarry, examined it and the stone, four loads of which were on the cars and open to inspection, pronounced the stone good, fit to go into the building, and ordered and directed plaintiffs to make a contract with Mr. Forrester for stone to finish the building. Thereupon the plaintiffs, in accordance with the direction of Superintendent McDonald, contracted with Forrester for stone to finish the building. A written contract was entered into, dated May 17, 1904. Thereupon Forrester commenced to quarry stone immediately and sent it to the mill to be sawed for delivery to the plaintiffs at the building. On May 28th plaintiffs received of Forrester the first consignment of stone, and all the same quality of stone defendants' superintendent, McDonald, examined and directed to be purchased. This stone McDonald also condemned, "pretty near all of it."

Plaintiffs continued to receive stone from the Forrester quarry up to the time they were put off the job by the defendants, and McDonald continued to condemn large parts of it, thus delaying plaintiffs in their work. McDonald would approve and then condemn the same stone. And again he would condemn and afterwards approve the stone. He was of one mind one day, and of another the next. The foreman Hout testified: "He [referring to McDonald] came there and condemned it at first, the first day he would condemn it and the next day he would accept it. He would come in and we would be at work and he would look around, say it was no account, and then afterwards he would come in and say it was all right, and then afterwards he would come in and condemn it again. . . . He would come around and condemn it after he had accepted it and again he would come in again and say it would be all right to go ahead and work on. . . . A. He did that right along." Mr. Hout stated he endeavored to induce McDonald to examine the stone before it was placed in the building and say whether or not it would be condemned, that McDonald refused and continued to reject stone after it had been placed in the building or after it was made ready to be placed in the building.

The evidence showed that McDonald in this way condemned a great deal of stone that ought not to have been condemned under the contract and that was good building stone. Some of the same stone condemned by McDonald while plaintiffs were on the job was accepted by him and put in the building after defendant terminated the contract.

In a conversation defendants' superintendent, McDonald had with Mr. Forrester about the time he directed the plaintiffs to buy stone from Forrester, McDonald asked Mr. Forrester what he was going to charge the plaintiffs for stone and when told by Mr. Forrester that he was going to charge the same price

he made to Mr. Moore before, McDonald replied, "Why don't you get more for it?" And when told by Mr. Forrester that he did not like to do that under the circumstances, McDonald said, "I am going to see Mr. Moore and tell him to get this stone from you and I will see that your stone is used in the building." Adding further, "We understand each other." McDonald further said to Mr. Forrester, "Of course I am going to use your stone in the building, nobody's but yours," and then added, "Of course any little present you give me afterwards is nobody's business." Defendants' superintendent, McDonald, for condemning the Pickle stone and recommending the Forrester stone, asked a bribe of Mr. Forrester. Failing to get the bribe he then condemned the Forrester stone as shown by the evidence before stated.

McDonald said to Mr. Graham, "He [McDonald] was going to take Moore Bros. down the line that they had never gone before and that they would know it before he got through with them, that he would make their heels hit the ceiling." Mr. Graham said he had other conversations with McDonald to the same effect. Mr. Graham testified further that he was hauling at the time for plaintiffs and that McDonald told him that plaintiffs were not paying him enough for his work and that they did not pay their hands wages enough.

Mr. W. L. Hyer testified that McDonald requested him to see James Miller, who was then working for plaintiffs upon this job, and induce Mr. Miller to quit work. Mr. Hyer afterwards saw Mr. Miller and repeated to him what McDonald had said.

Plaintiffs were delayed in the construction of the building some week or ten days by a strike of the hands.

Mr. A. A. Moore testified that the delays heretofore mentioned all told amounted to five months and

a half. Mr. Hout, plaintiffs' foreman, stated that the delays amounted to about four months.

Mr. James A. Moore, on cross-examination, testified that he made the figures and presented the bid for plaintiffs for the construction of this building and that there was a reasonable profit in the contract for the plaintiffs had they been permitted to complete the building. Mr. Moore presented his figures made at that time, which corroborated his statement. Mr. Moore further testified that McDonald at the time showed him the figures that he had made, which ran about $40,000 for the construction of the building.

Plaintiffs' evidence tended to prove that Mr. A. A. Moore on the part of the plaintiffs gave the building his personal and all necessary attention and supervision, and that D. M. Hout, the foreman employed, was a competent man.

The court submitted the question as to the causes of the delay in the construction of the building to the jury.

The defendants' evidence did not contradict the testimony of the plaintiffs, but corroborated it.

Defendants introduced no testimony in conflict with plaintiffs' testimony showing that it was practicable to have commenced the construction of the building immediately upon the execution of the contract in the fall of 1903, and to have proceeded until the building was finished; that McDonald, defendants' architect and superintendent, refused to permit plaintiffs to commence upon the execution of the contract, but delayed them until the spring of 1904, and that plaintiffs were delayed by the unusual and unprecedented rainfall in the spring of 1904, and by a strike.

Defendants' architect and superintendent, George E. McDonald, was sworn by defendants and testified in the case. He did not deny that he had ordered plaintiffs not to commence the building until spring, 1904, or that he had condemned all of the Pickle stone.

He admitted that he had directed plaintiffs' foreman, Dan Hout, to buy the Forrester stone. He did not deny that he afterwards condemned the Forrester stone without cause, wilfully and wantonly, and caused much delay thereby as testified to by Mr. Hout. He did not deny the conversation sworn to by W. L. Hyer, in which he asked Hyer to induce plaintiffs' employee, James B. Miller, to quit work on the building. Defendants' evidence showed that at about that time McDonald, as defendants' superintendent, wrote a mandatory letter of date June 29th, commanding plaintiffs to furnish more hands. He denied that he asked Forrester for a bribe, as testified by Mr. Forrester, or that he had tried to induce Mr. Graham, in the employment of plaintiff, to demand higher wages, or that he had said to Mr. Graham that he would give plaintiffs a rougher experience in the performance of this contract than they had ever had before, as testified by Mr. Graham.

Defendants' evidence showed that after they terminated the contract with the plaintiffs they, in connection with their superintendent, George E. McDonald, made a contract with the Pickles for stone to finish the building and with which they did finish the construction of the building. The stone furnished by Pickle to defendants and their superintendent, McDonald, was from the same quarry and the same character of stone as that furnished by Pickle to plaintiffs and condemned by defendants' superintendent, McDonald, and was practically all approved, a very small portion of it condemned. Defendants' bookkeeper testified that the total of Pickle's bill for stone under this contract was $6,274.76, and the total amount of stone rejected amounted to only $248.50, being less than four per cent, and he further stated that this deduction arose partly on account of stone not being prepared in proper sizes and over a controversy as to a blacksmith bill.

215 Sup—46

Defendants' evidence tended to prove that plaintiffs contracted for less than they could construct the building, by reason whereof plaintiffs desired to throw up the job. Defendants for that purpose called Joseph Stone as an expert. Mr. Ludlow's testimony was like unto Mr. Stone's, by agreement of parties. Mr. Stone testified that the labor performed and material furnished by plaintiffs were better than the contract called for. He further testified that he had a conversation with defendants' architect and superintendent, George E. McDonald, and that McDonald stated that he had figured on the cost of the building according to plans and specifications and that it could be built for less than $47,500.

Defendants introduced Charles Briener, who testified that he had been a stone contractor and superintendent for forty years, that he had built Convention Hall in Kansas City, that he examined the building after plaintiffs were put off the job, and that the material furnished and labor performed by plaintiffs were better than the contract called for and that he had told McDonald so. He stated further, in response to question by defendants, that the work performed by plaintiffs was the hardest part of the job. He said: "Laying the work and putting on the corners and getting ready for the work to be established is the hardest part and when you get to a certain height you have certain preparations for all of your material and you can rush it and it is easier." McDonald entered no denial to this testimony or the testimony of Joseph Stone to the same effect. Nor did he deny that he stated to James A. Moore that the building could be erected for $40,000 as testified to by Moore.

As to the question of the value of the material furnished and labor performed by plaintiffs, defendants introduced testimony in conflict with the estimates testified to by plaintiffs' witnesses. Defendants, however, introduced no itemized statement showing the

value of the material furnished and labor performed by plaintiffs. They introduced estimates and the opinions of experts upon measurements furnished by others and partial statements and estimates. Defendants' witness, Volmer, testified that he had made three estimates, no two of which were alike. One of defendants' superintendents, J. N. Suddath, testified that he had made an itemized statement of the estimates he had testified to and referred to "Exhibit 36." On examination of "Exhibit 36," it was found that it was a statement made by Volmer, defendants' stone foreman, and only purported to itemize the material left on the ground, without any reference to the labor or material in the building and was in part of lumping estimate.

Defendants' testimony showed that after they took charge of the building they took their time and spent money freely. Defendants retained the services of their superintendent, George E. McDonald, hired Mr. J. N. Suddath to superintend, John Volmer superintendent or foreman of the stonework on the stone building, and Samuel Bratten to keep books for the "Board of Regents at the gymnasium building," all in addition to the employees who labored with their hands. In this way the labor account amounted to $16,769.75, in a total expenditure for labor and material of $32,181.65. In other words, defendants expended $16,769.75 to put in place in the building only $15,411.90 worth of material.

One of the defendants' superintendents, George E. McDonald, testified at the trial on the 21st day of August, 1905, eleven months and five days after defendants terminated the contract, that he would spend another three months and would expend $20,493.90 more money in completing the building.

Defendants offered no evidence as to the item of $3,250, which the answer alleges they had and would spend in litigation over this contract.

I. The right of plaintiffs to recover the actual value of the materials furnished and work and labor done by them in the construction of the building on the land of defendants, not exceeding the contract price and appropriated by defendants, *less* any damages suffered by defendants by reason of the failure of plaintiffs to comply with the contract for the construction of the building, was clearly recognized by defendants in the instruction requested by them and given by the circuit court. Repeated decisions of this court establish this principle of law in this State. [Thompson v. Allsman, 7 Mo. 531; Lee v. Ashbrook, 14 Mo. 379; Marsh v. Richards, 29 Mo. 105; Yeats v. Ballentine, 56 Mo. 530; Williams v. Railroad, 112 Mo. 1. c. 498.] There is no disagreement as to the law as to this proposition. But defendants complain of the first instruction given for plaintiffs. That instruction directed the jury that if they found from the evidence that defendants wrongfully terminated the contract and refused to permit plaintiffs to finish the building, then plaintiffs were entitled to recover the reasonable value of the work done and materials furnished by them, up to the day the defendants refused to permit plaintiffs to carry out the contract, not exceeding the amount alleged in the petition, to-wit, $22,086.95, less the admitted payment made by defendants, to-wit, $9,008, and not exceeding $13,078.95, the balance claimed in the petition. Thus a different principle was invoked, to-wit, that if the defendants wrongfully and arbitrarily refused to permit plaintiffs to carry out their contract, the plaintiffs were entitled to recover the actual value of the work and the materials furnished by them and appropriated by defendants, without diminution by any alleged damages suffered by defendants by the failure of plaintiffs to complete the contract according to its terms. In other words, if the jury found that defendants wrongfully refused to permit plaintiffs to

carry out their contract, then whatever damages ensued was the result of their own wrongful act. The defendants adopted this view of the law in their first instruction given by the court, and cannot now be heard to complain of plaintiffs' instruction asserting the same doctrine. [Bean v. Miller, 69 Mo. 384; Halpin v. Manny, 57 Mo. App. 59.]

This first instruction of plaintiffs is challenged because it is asserted that it is a peremptory direction to the jury to find for the plaintiffs, even though the amount theretofore paid by defendants was equal to or exceeded the value of plaintiffs' work and materials. This is a misconception of the instruction. The right of plaintiffs to recover the value of the work done and materials furnished, without diminution by damages, was conditional, first, that the jury should find that defendants wrongfully refused to permit plaintiffs to perform their contract, and second, in no event were the jury permitted to find beyond the reasonable value of the work and labor furnished up to the day they were forbidden to do anything further on the building, and they were peremptorily required to allow defendants the amount already paid to plaintiffs.

As to the further criticism, that the instruction left the jury without any guide as to what would constitute a wrongful termination of the contract by defendants, we think it was equally groundless. The jury were fully advised in plaintiffs' second instruction and defendants' fourth instruction as to what conduct on the part of the plaintiffs would have justified defendants in dismissing plaintiffs and doing the work themselves. The instructions were to be considered together, and when so read, the jury could not have been misled as to what conduct on part of plaintiffs justified defendants in taking the building out of their hands, especially when defendants' instructions 7 and 8 are considered. We think the objections are without basis. Moreover, the jury found a sub-

stantial sum for plaintiffs after allowing the credit, and obviously understood the instruction required them to allow the credit, and only find for plaintiffs the value of the work and materials, less the credit.

II. On the oral argument and in the briefs the insistence was and is that the verdict was excessive. The evidence on the value of the work to be done and materials furnished was all before the jury. Plaintiffs left nothing to conjecture as far as they could avoid it. When they were ordered to stop work, they called in an expert contractor and builder, and they went over the whole work and measured it and made an itemized statement of all the work and materials. This original statement was before the jury. The witnesses who made it and did the measuring were examined upon it. On the other hand, the evidence as to the value of the work on the part of the defendants was of an unsatisfactory character and the jury credited plaintiffs' witnesses. We see nothing in the record which would justify us in disregarding the finding of the jury as the result of passion, prejudice or obvious mistake. The verdict was approved by our brother on the circuit who saw and heard the witnesses. This assignment must be ruled against the defendants.

III. Defendants now say in their third assignment of error that, under the contract, the opinion of their architect was final in the absence of fraud, and that there is no charge of fraud in the reply. As to this, the reply pleaded that the architect wrongfully, wilfully and without any cause condemned and rejected the material furnished by plaintiffs, and defendants accepted this as a sufficient plea that the contract had been arbitrarily terminated and by their fourth instruction advised the jury of the right of the architect to reject material and "unless such condemnation showed a design on his part to *abuse* his powers or to wilfully interefere with and retard the

progress of the work," his action afforded no excuse to defendants. Having tendered the issue in this form, defendants are in no attitude to complain that the action of the architect was not required to be fraudulent.

IV.  Error is asserted in refusing defendants' fifth and eighth instructions and giving their converse, in instruction numbered three given for plaintiffs, in these words:  "The court instructs the jury that the defendant in this case cannot in any event recover the sum of twenty dollars per day or any part thereof by reason of the provision in the contract providing that plaintiffs shall pay to defendants the sum of twenty dollars per day for each week day intervening after December 1, 1904, until the completion of the work."

Article 8 of the contract provided:  "The contractors hereby agree to commence work upon the building within one week from the date of the approval of their bond by the president of the board and to cause steady progress of same and to complete the works according to the drawings, plans, details and specifications in their true and full meaning on or before the first day of December, 1904, and upon their failure to so complete the work at the above-mentioned time they shall pay the board the sum of twenty dollars per day for each week day intervening after said date until the completion of the work."  The defendants prayed the court in effect that if plaintiffs failed to comply with their contract and by reason thereof it was necessary for defendants to take charge of and proceed to complete the building at a reasonable cost and in a reasonable time, then defendants were entitled to recover twenty dollars a day as liquidated damages as a counterclaim, not to exceed $6,260, the time defendants claimed necessary to complete said building being 313 days.  It is conceded defendants terminated the contract over two months before the time fixed by contract.

This penalty of twenty dollars a day was allowed defendants only on condition that plaintiffs completed the contract but failed to finish it in the time specified.

Article 4 under which defendants asserted their right to take charge and complete the contract, makes no provision for this penalty, but bound plaintiffs and their surety to make good all reasonable expenses, charges, damage and cost of litigation.

In Gallagher v. Baird, 66 N. Y. Supp. 1. c. 762, 763, a builder, sued on his bond, sought to limit his liability to the penalty in a contract like this, but the court said: "It is manifest that this clause contemplated a completion of the contract, with damages for delay. There was no completion, or attempt to complete, but an utter abandonment, and such clause was not intended to cover such a case, nor was provision made in the contract for such a contingency." It was held the penalty was not the measure of damages, and obviously it was not.

We cannot interpolate this clause for penalty into article 4 of the contract. We think the court was unquestionably right in refusing the defendants' instructions on this point and in giving plaintiff's as above set out.

V. Various objections are urged against plaintiffs' second instruction, but we have practically disposed of some of them in what we have already said. As to the contention that it assumes the architect interfered with plaintiffs with regard to the concrete, and in rejecting material, a reference to the instruction is a sufficient answer. It expressly submitted those questions to be found by the jury. We think it does not conflict with defendants' instructions.

VI. Instruction six requested by defendants was properly refused. The contract did not authorize defendants to terminate the contract if plaintiffs furnished an inferior grade of stone. It gave the archi-

tect the power to reject the improper stone but not to cancel the contract on that ground.

VII.   It is argued that plaintiffs had made an improvident contract and were seeking some pretence to get out of it.   All that matter was threshed out before the jury.   The evidence consisted of opinions of various builders as to what the building would have cost if built according to plans and specifications.   Some thought it would have resulted in loss to plaintiffs; others, that there was a fair profit in it.   The jury were competent to pass upon all such suggestions as these and the good faith of plaintiffs.   Certain it is that the termination of plaintiffs' contract has resulted in a large increase of the cost of this building.   It is not our province to pass upon the weight and credibility of the witnesses, but if the plaintiffs' witnesses are to be believed, as they evidently are, then the jury were fully warranted in finding that the architect did not deal fairly with plaintiffs and that his conduct in delaying the commencement of the building and in regard to the stone was without justification.   The defendants have received plaintiffs' work and labor and materials and it seems to us that the jury correctly required them to pay for it.

The judgment is affirmed.   *Fox,* and *Burgess, JJ.,* concur.