## MARYLAND CASUALTY CO. v. CITY OF CINCINNATI et al.

(District Court, S. D. Ohio, W. D.   March 19, 1923.)

No. 247.

1. **Insurance** ⬦679—Surety reinsuring part of loss held bound to account pro tanto for anything received.

Where contractor's surety reinsured itself against one-half its loss in two other companies from which it received a certain sum in adjustment of their liability, it was bound to account to them pro tanto for what it might recover by assertion by way of subrogation of rights of contractor and city with which contract was made.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Insurance ⊛=606(5)—Surety reinsuring part of loss entitled to sue in its own name, but recovery would be in part for benefit of reinsurers.**

Where contractor's surety reinsured one-half of its loss on its bond, it was not thereby prevented from suing in its own name for full amount to which it was entitled by subrogation to rights of contractor and other party to the contract, but recovery would be for interests of itself and its reinsurers as their interests might appear.

**3. Principal and agent ⊛=131—Principal bound by acts within scope of actual or apparent authority.**

Principal is bound by acts of his agent within scope of such authority as he has or is held out by his principal to have.

**4. Principal and agent ⊛=120(1)—Words and acts brought home to principal considered in determining extent of authority.**

All words and acts brought home to principal may be considered in determining extent of agent's authority.

**5. Principal and agent ⊛=119(1), 147(2)—One dealing with agent bound to take notice of extent of authority and has burden of proof.**

One who deals with another's agent is bound to take notice of extent of his authority, and, when authority is denied, has burden of proof to show it.

**6. Principal and agent ⊛=99—Acquiescence in subsequent acts does not amount to representation of authority for particular act.**

Acquiescence by casualty company in subsequent acts of its agent could not amount to holding out or representation of authority for particular act, authority for which was in dispute.

**7. Principal and agent ⊛=99—Acquiescence in subsequent acts held to be considered on question of authority, but not to compel conclusion of authority.**

In determining whether casualty company's agent had actual authority to do a certain act, acquiescence in subsequent acts of the agent may be looked to, but the fact that it subsequently gave him a free hand after trouble had arisen and representation was necessary did not impel conclusion that he had authority before any trouble arose.

**8. Principal and agent ⊛=123(6)—Authority to sign paper not inferred from fact of signing.**

Probability that agent of contractor's surety had authority to consent to assignment by the contractor of moneys coming due under the contract may not be inferred from the fact that he did sign such consent.

**9. Principal and agent ⊛=100(6)—Act or acquiescence with knowledge essential to finding of authority.**

Before authority on part of agent of contractor's surety to consent to assignment by contractor of moneys coming due under the contract can be found, there must be some act or acquiescence with knowledge brought home to the surety sufficient to warrant reasonable inference of authority.

**10. Guaranty ⊛=36(3)—Contractor's surety held to have agreed that estimates received by it would be applied on notes guaranteed by it.**

Guarantee of contractor's notes to a bank by his surety and indorsements on the notes *held* to require that avails of estimates received by the surety, as well as the bank, should be used to extinguish the notes.

**11. Subrogation ⊛=36—One loaning money to contractor not subrogated to rights of materialmen and laborers as against surety's right of subrogation.**

Bank voluntarily lending money to contractor, even though it went into the work being done, could not be subrogated to rights of materialmen or laborers as against right of subrogation of contractor's surety which furnished funds under compulsion of its bond.

**12. Equity ⊛=65(2)—Diversion of money by surety agreeing to apply it on notes held not to defeat set-off against another liability.**

That contractor's surety, which had agreed that avails of estimates due under contract should be applied to payment of contractor's notes to a

⊛=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

bank guaranteed by it, diverted part of money so received to other purposes, did not, under the doctrine of clean hands, preclude it from setting off its liability for the money so diverted against a liability of the bank to it.

**13. Subrogation ⚖=>41 (3)—Surety's right held not barred by "laches" as against bank not induced to take step detrimental to its interests by delay.**

"Laches" is not merely delay, but delay that works disadvantage, and, where bank to which contractor assigned moneys coming due was not induced to take any step detrimental to its interest by delay of contractor's surety in asserting its right of subrogation, the surety's claim was not barred by laches.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Laches.]

**14. Subrogation ⚖=>41 (6)—Implication of waiver of rights should be clear to warrant finding.**

To warrant finding that contractor's surety waived right of subrogation to contractor's rights in ·moneys due under contract, the implication should be clear from the evidence as to what was said and done.

**15. Subrogation ⚖=>35—Surety. held not to have waived right by permitting moneys to be applied on notes which it had agreed should be so paid.**

Where contractor's surety had guaranteed certain notes of contractor to a bank and had agreed that they should be paid from proceeds of estimates and it promptly protested against application of part of final estimate to payment of other unguaranteed notes, it did not, by permitting the bank to receive such estimates, waive its right to be subrogated to contractor's rights in moneys coming due.

**16. Subrogation ⚖=>36—Surety held entitled to follow funds into hands of third person for purposes of set-off.**

Contractor's surety, which, by reason of moneys advanced by it, had become subrogated to contractor's rights in moneys due under contract, was entitled to follow the fund into hands of contractor's assignee, at least for purpose of offsetting it against claim of the assignee against it.

In Equity. Action by the Maryland Casualty Company against the City of Cincinnati and others. Decree for plaintiff as stated in the opinion.

Nichols, Morrill, Stewart & Ginter, of Cincinnati, Ohio, and George Cushwa, of Baltimore, Md., for plaintiff.

Michael Muller, of Cincinnati, Ohio, for defendant Foley.

Frank F. Dinsmore, of Cincinnati, Ohio, for defendant Columbia Bank & Savings Co.

L. F. Forchheimer and Dennis J. Ryan, both of Cincinnati, Ohio, for defendant City of Cincinnati.

PECK, District Judge. In this action the plaintiff, a surety company which expended funds to complete the contract of its principal, D. P. Foley, to build a part of the Millcreek sewer for the city of Cincinnati, seeks to be subrogated to the rights of the city in the reserved 5 per cent., amounting to $10,021.35, held by the city to secure faithful performance of the contract, and this subrogation is sought not only as against the city and against Foley, but also as against the defendant the Columbia Bank & Savings Company, to which Foley had assigned the proceeds of the contract.

The defendant the Columbia Bank & Savings Company answers,

setting up a counterclaim arising out of the same general transaction against Foley and the Maryland Casualty Company, for $22,900, on certain notes of Foley's for pay roll advances conditionally guaranteed by the Maryland Casualty Company. The corporate parties are hereinafter spoken of as the city, the casualty company, and the bank, respectively.

It has been heretofore determined, upon motion to dismiss the bill, that the surety company's right of subrogation, if it became effective at all by subsequent advancements toward the completion of the contract, was prior to the right of the bank arising from the assignment of the proceeds of the contract made by Foley to it. The remaining questions arising on the bill are: First, whether it has been shown that the casualty company did in fact advance moneys for the completion of the contract; and, if so, secondly, whether it has lost its priority by a consent which its agent, Fredriks, indorsed upon the assignment in favor of the bank.

(1) The casualty company, to save itself from loss on its bond, advanced to Foley and paid out $26,752.70 net, over and above any money that it received back from any of the parties hereto, and was put to a loss of that sum to bring about the completion of the work. This finding is based upon the report of the auditor appointed by the court. His conclusions appear to be sound, and are in substantial accord with the other evidence in this case.

[1, 2] The casualty company had reinsured itself against one-half its loss upon this bond in two other indemnity companies, from which it received, upon adjustment, $17,417.85. By the terms of its agreements with its indemnitors, and by the law in the absence of such agreements, it is bound to account pro tanto to them for what it may recover by the assertion of the rights of Foley and the city, to which it is subrogated. Travelers' Ins. Co. v. Great Lakes Engineering Works Co., 184 Fed. 426, 107 C. C. A. 20, 36 L. R. A. (N. S.) 60. For a general discussion of this subject, see 26 Corpus Juris, p. 466. The fact that it reinsured does not, however, prevent it from prosecuting this action in its own name for the full amount of its subrogated rights, but the recovery will be for the interests of its reinsurers and for its own interest, respectively, as the same may appear. See the same reference to Corpus Juris.

[3-5] (2) That a principal is bound by the acts of his agent within the scope of such authority as he has or is held out by his principal to have; that all words and acts brought home to the principal may be considered to determine the extent of that authority; that beyond the extent thereof so determined the principal is not bound; and that one who deals with the agent of another is bound to take notice thereof, and, when the authority is denied, bears the burden of proof to show it —are propositions firmly established. Mechem on Agency, § 743.

[6-9] The act in question was one of importance. It involved, upon the bank's interpretation of it, the waiving of substantial rights on the part of the casualty company. It was not an act necessarily incident to the making of the bond which was authorized, but, on the contrary, was in derogation of the rights which would flow from the

specifically authorized contract. The evidence does not show that Fredriks had specific authority, either general or special, to enter such waiver. There is not sufficient evidence to warrant the conclusion of a previous general holding out of such authority by the casualty company. Fredriks had signed such consents as to the bonds of other contractors, but the evidence does not show that the casualty company had knowledge of this. The evidence certainly does not show that it was so generally done by Fredriks and acquiesced in by the casualty company as to amount to a holding out of such authority to the general public; nor does the evidence show that the bank had knowledge of such previous acts of consent by Fredriks or that it relied thereon. The evidence shows no other prior act such as would warrant a reasonably prudent business man in believing that Fredriks had such authority at the time this consent was given. The acquiescence of the casualty company in the subsequent acts of Fredriks could not amount to a holding out or representation of authority for this act. They may be looked to, however, in determining whether Fredriks had actual authority; but because the casualty company gave Fredriks a free hand to deal with the situation after trouble arose, when it necessarily had to be represented on the ground by someone, does not impel the conclusion that he had authority to enter a waiver of his company's right to subrogation before the trouble arose and at the time when all was proceeding satisfactorily. The court may not infer a probability of authority from the fact that Fredriks did sign the paper. There must be some act or acquiescence with knowledge brought home to his principal sufficient to warrant a reasonable inference of authority before it can be found. Upon a careful scrutiny of the evidence, none is found. The matter is determined by the law concerning the burden of proof. The evidence has been examined with that rule in mind which declares that it is to be considered in the light of what it is possible for the party to produce under the circumstances. Nevertheless, upon a careful examination, I am unable to find sufficient proof of Fredriks' authority to enter this waiver to warrant me in holding that he had such authority. It must not be lost sight of that the bank had it within its power to require evidence of authority at the time it relied upon this consent, if it did rely upon it. Therefore it must be concluded that Fredriks' consent was without authority here shown, and cannot be considered binding upon the casualty company; and so that company, upon the bill, must prevail.

### The Counterclaim.

On the guaranties of the casualty company of Foley's notes aggregating $22,900 aforesaid:

On April 8, 1920, Foley, being in financial extremities and having pay rolls coming due for both the Millcreek sewer and the Rapid Transit jobs, applied to the bank for a loan to meet the same. He then owed the bank $26,500 on promissory notes executed prior to March 1st, secured by the assignment aforesaid and, to some extent, by collateral. The bank refused to loan the money until the casualty company offered, in the event the amounts to become due from the city

under the estimates should be insufficient to repay the loan, it (the casualty company) would do so, the bank to apply any estimates so received. Thereupon the following letter of guaranty was given by the casualty company:

"Cincinnati, O., April 8, 1920.

"The Columbia Bank & Savings Company, Court and Vine Sts., Cincinnati, O.—Gentlemen: Confirming our conversation had with your Mr. Stamm to-day, with reference to advancement of pay roll to D. P. Foley on the Mill Creek and Rapid Transit jobs due Friday, April 9, 1920, in a sum not to exceed $5,000.00, the Maryland Casualty Company of Baltimore agrees that in the event that the estimate payable by the city of Cincinnati to D. P. Foley growing out of either of said contracts be insufficient to repay to you the amount of your above-described advancement, the Maryland Casualty Company will indemnify you to the extent of such insufficiency, it being understood that you are to so apply any estimate so received.

"Yours very truly,          The Maryland Casualty Company
                                       "By [Signed]  Emil L. Hoen, Manager."

This was the beginning of a series of such transactions, and the situation on the 8th of January, 1920, was that the bank held six of such notes, similarly guaranteed, in all aggregating $22,900, and on that day received from the city of Cincinnati, under its assignment, the proceeds of Foley's final estimate, amounting to about $34,697.66. This sum it applied, not to the extinguishment of these guaranteed notes, but first to the payment of the aforesaid $26,500 of notes unsecured except by the assignment. Its pleading claims that this was done by agreement with the casualty company and Foley, but it has not sustained the burden of proof in this regard. Of the remainder of the money, $7,281.15 was put to Foley's credit for the payment of a certain pay roll then due on the Rapid Transit contract and a supply bill in favor of the Cincinnati Quarries Company, and was so used, and apparently the casualty company benefited to the full extent of the application of said sum, as it was under bond to see these obligations met. $899.81 was used to pay a note given the bank by the firm of Foley & Dannenhauer, and $16.70 remains on hand at the bank.

[10] It is claimed by the bank that the surety company is liable upon the guaranty, notwithstanding the proviso that the bank was to apply any estimates received to the guaranteed notes, as to notes of November 27, 1920, and December 31st, because Foley drew estimates on the Rapid Transit contract which were applied, under the direction of the casualty company, to the extent of $6,000, to the payment of other construction obligations. The casualty company denies that the guaranty contains a promise that it would apply any estimate received by it from the Rapid Transit contract, under its assignment thereof, to the extinguishment of these notes. The agreement is loosely drawn and is susceptible of several interpretations.

The indorsements upon the notes themselves help to clarify the situation. That of November 27th is indorsed:

"To be applied to pay roll purposes and estimates on Millcreek and Rapid Transit applied to liquidation of same. Maryland Casualty Co., Gerritt J. Fredriks, Jr."

That of December 11th reads:

"To be applied % pay roll and incidentals and deducted from estimates received from Rapid Transit or Millcreek contract."

That of December 18th reads:

"This note for pay roll on Millcreek and Rapid Transit contracts and estimates on said work to be applied on account hereof."

That of December 20th:

"To be applied to pay roll purposes and taken out of estimates on Rapid Transit and Millcreek."

That of December 24th:

"To be used for pay roll purposes on Millcreek and Rapid Transit contracts and taken out of said estimates."

That of December 31st reads:

"To be taken out of Rapid Transit estimate and applied to Rapid Transit estimate."

All being signed "Maryland Casualty Co., by Gerritt J. Fredriks, Attorney." All of these indorsements except the last, which has reference solely to the Rapid Transit contract, contain a promise by the Maryland Casualty Company that estimates upon the Rapid Transit, as well as the Millcreek, work, should be applied to the extinguishment of the same. That of November 27th is clearly so.

Taking both documents together, it is apparent that it was the agreement that the avails of the estimates from both jobs should be used, as received, in extinguishment of the notes. The plaintiff, the casualty company, agreed: First, to apply these estimates; and, second, to pay the notes if the estimates did not reach. The defendant bank agreed to apply the estimates (Millcreek) which it should receive.

The bank had Foley's individual notes for $26,500. It held his guaranteed notes for $22,900. On December 4th there was a payment of $2,000 upon a Rapid Transit estimate, which was diverted by the casualty company and not used, as agreed, in the extinguishment of the guaranteed note of November 27th. In January, $4,000 received from Rapid Transit estimate pledged to the note of December 31st for that amount was similarly diverted, making $6,000 in all. This $6,000 it seems proper to charge against the plaintiff, the Maryland Casualty Company, for the extinguishment of a like amount of the guaranteed notes. That would leave guaranteed notes to the sum of $16,900. The avails of the final estimate, $34,697.66, should, under the terms of the contract of guaranty, be first applied to the extinguishment of this $16,900 of guaranteed notes. That would leave a balance of $17,797.66 in the fund resulting from the final Millcreek estimate. This balance should be devoted first to the payment of $7,281.15 on account of the pay roll and the Cincinnati Quarries Company, which all parties agreed should be paid. That leaves a balance of $10,516.66 of the avails of the Millcreek final estimate still to be applied.

The casualty company claims that this balance belonged to it by right of subrogation, upon the principles hereinbefore held. This the bank denies, upon several grounds: (1) That the right of subrogation has

no application because the unguaranteed loans of the bank to Foley were for the very purpose of carrying out the contract; (2) that the casualty company does not come into court with clean hands, having first violated the contract to apply the Rapid Transit estimates; (3) that the advancements upon which subrogation is claimed may have been made later; (4) that the casualty company was guilty of laches in not sooner asserting such subrogation to the balance; and (5) that it waived its right of subrogation in standing by and knowingly permitting the bank to draw the final estimate without making claim to the balance of the fund.

[11] (1) It has been heretofore held that the doctrine of subrogation put the casualty company ahead of the bank. The bank was under no compulsion to loan money to Foley. Its act in so doing was voluntary; therefore, even though the money which it loaned went into the work, nevertheless it could not be subrogated to the rights of materialmen or laborers generally, as against the casualty company, which furnished funds under the compulsion of its bond. See authorities cited in opinion on motion to dismiss this bill.

[12] (2) The doctrine of clean hands does not have application to the present problem. While plaintiff breached its contract by failure to apply the Rapid Transit estimate upon the two notes aforesaid, its conduct in that regard cannot be termed fraudulent, illegal, or unconscionable, as would be necessary to debar it from a court of equity upon this maxim. 21 Corpus Juris, 183. It has already been ruled that it became liable for the $6,000. It now seeks merely to defend against this liability by the ordinary set-off of one claim against another. Under the circumstances, it ought not to be denied the right to present this contention.

(3) An examination of the account submitted shows that up to and including January 15th the casualty company had made all of its advancements except some $9,000. Therefore, its equity of subrogation was to the extent of about $17,000 complete at that time.

[13] (4) Laches is not merely delay, but delay that works a disadvantage. McClean v. Bradley (D. C.) 282 Fed. 1011. The bank's position has not been altered to its disadvantage. It has retained the entire fund ever since, and has been induced to take no step detrimental to its interest, that can be perceived, by reason of the delay of the plaintiff to assert its claim to the residue of the fund.

[14, 15] (5) Did the plaintiff waive its right of subrogation to the balance of the final estimate? It did not do so expressly, and if there was a waiver, it must have been by implication. In order to warrant the finding of such a waiver, the implication should be clear from the evidence as to what was said and done. This implication the defendant contends lies in the fact that the casualty company knew that the bank held an assignment of Foley's estimates, had drawn them in the past, and proposed to draw the final estimate, and coupled with the further fact that the casualty company knew that there would be a balance over and above the amount necessary to pay the notes which it had guaranteed, and yet made no claim to such balance. To test this claim the facts must be examined.

The estimates which the bank had theretofore drawn from April 8, 1920, when the casualty company apparently became aware of the assignment, until the final estimate in January, 1920, were absorbed in the extinguishment of notes which Foley had given and which the casualty company had guaranteed. It had been agreed between the parties that they should be so used; consequently the bank's appropriation of those estimates to that purpose, under such contract, cannot be regarded as an acquiescence or assent by the casualty company that the bank might have any balance that might remain. Nor can such course of dealing be regarded as a waiver by the casualty company of its equity of subrogation.

We come then to the conduct of the casualty company with regard to the final estimate. The manner of its application was to have been for the discussion of the parties before finally determined upon. But such discussion was not had, and there was no agreement as to how it should be applied when the bank received it. Upon receipt of the amount the bank applied it first to Foley's individual notes, over the vigorous protest of the casualty company. In that there was no acquiescence. The casualty company, by letter prepared by its counsel, demanded that it should be applied to the entire amount ($22,900) of the guaranteed notes, which would include the $6,000 that the casualty company had theretofore failed to pay out of the Rapid Transit estimates. In making this demand the casualty company did set up claim for the $6,000 now in controversy. The balance was actually applied by the bank to obligations which the casualty company was, by the terms of its bond, bound to meet; that is to say, the pay roll then due and the account of the Cincinnati Quarries Company. Therefore it is seen that the casualty company protested the application of one part of the fund and received the benefit of the remainder. From neither of these acts is it possible to conclude that it waived its right of subrogation to the balance after the guaranteed notes had been extinguished.

It is said of subrogation that the right of substitution is everything, actual substitution nothing, for by a fiction the law has made the assignment already. 37 Cyc. 417. The result must be that the casualty company was, even at that time, the first assignee of Foley of the $34,-697.66 which was paid by the city to the bank by virtue of Foley's assignment to the bank, which was second in equity. The action of the casualty company in permitting the bank to draw the fund implies no waiver when it is remembered that it had agreed that the bank should be permitted to apply this fund to the notes which it had guaranteed. The rights stood thus: First, the bank had a contractual lien on the fund to the extent of the guaranteed notes; second came the casualty company's right by subrogation; third, the bank's right under its assignment. The casualty company, in permitting the bank to draw the fund from the city, acceded to the first, but did not waive the second.

[16] For the purposes of the offset against the $6,000, at least, the casualty company is entitled to follow this fund.

"Generally the right of the surety to subrogation can be enforced against all persons claiming under the principal, with notice of the facts, actual or constructive." 37 Cyc. 428.

291 F.—53

The inevitable result of these considerations is that the surety company, although it violated its agreement by diverting $6,000 from the Rapid Transit estimates, is nevertheless entitled by subrogation to set off, as against this claim, the balance in the hands of the bank from the proceeds of the final estimate. Therefore the liability of the surety company upon the guaranteed notes set up in the counterclaim has been extinguished, as to $16,900, by the failure of the bank to comply with the condition of the guaranty which required it to apply the final Millcreek estimate thereto; as to the remaining $6,000, by set-off of the casualty company's valid claim to the remainder of the estate in the hands of the bank.

Both of these defenses are peculiar to the surety and do not inure to the benefit of Foley, the maker of the notes.

Plaintiff will have decree for the reserved 5 per cent. in the hands of the city, $10,021.35, less $500 heretofore ordered paid the auditor, leaving a net balance of $9,521.35. The counterclaim of the Columbia Bank & Savings Company, as set forth in its answer, upon $22,900 of notes guaranteed by the Maryland Casualty Company, will, as against the Maryland Casualty Company, be dismissed for want of equity, but as against the defendant Foley will be sustained, and it may have decree against him for the aforesaid sum of $22,900 and interest upon the notes.

One half the costs will be charged against the plaintiff, and the other half against the defendant the Columbia Bank & Savings Company.