JOHN SHIELDS et al.

*v.*

THE JOHN SHIELDS CONSTRUCTION COMPANY et al.

[Decided April 11th, 1913.]

1. A contract between a railway company and a contractor for the building of a section of a tunnel (under section 34) provided that the latter should pay the former as damages in default of completing the works by the agreed date, "a sum equal to 1/50 of one per cent. of the amount paid or to be paid him for the entire work for each and every day the time consumed on said work and completion may exceed the time herein allowed for that purpose, which said sum, in view of the difficulty of ascertaining the loss which the Company will suffer by reason of delay in the performance of the work hereunder, is hereby agreed upon, fixed and determined by the parties hereto as the liquidated damages that the Company will suffer by reason of said delay and default, and not as penalty, and the Company shall and may deduct and retain the amount of such liquidated damages out of the moneys which may be due or be-

come due to the. contractor under this agreement," and in case the company should declare the contract at an end, as was done, it further provided (under section 35, subsection 2) that the company *may make a new contract* for construction with other parties *upon such terms as the Company may deem proper;* the same to provide among other things that the new contractor shall allow, for so much of construction as has been already completed, a reasonable amount to be prescribed in such new contract, or to be ascertained as in such new contract to be provided; and in such case the contractor shall pay the Company for all damages which the Company shall sustain by reason of such failure, *including* the excess, if any, of the amount which the Company shall pay the new contractor over the amount it would have had to pay the contractor party hereto for the same work and materials, *together with the amount, if any, which shall be due the Company, by reason of the delay in completion of the construction* and completion of the entire work." After the contractor had done a certain portion of the work, it became insolvent, and the railway company made a new contract with another contractor who completed it at the same rates as the original contractor had contracted for, and as far as appears, no damage in fact resulted from delay in construction, inasmuch as the other sections of the work had not been finished. Upon the railway company's claiming liquidated damages, calculated according to section 34—*Held,* that it is plain that the contract does not provide for liquidated damages in the event that has happened.

2. Every line of paragraph 34 indicates that the case there provided for is that of the original contractor who fails to complete *within the time agreed upon.* The assumption is that such contractor is doing the work, up to the very time of completion, and that it is *his* delay which is causing the loss. In that event the company is authorized to deduct and retain from the contract price, stipulated to be paid, to him, the liquidated damages, calculated as section 34 provides. Under subsection 2 of section 35, on the other hand, provision is made for the possible loss that may ensue, where the company has been obliged to do the work itself or to employ and pay a second contractor. Here the conditions are different. The first contractor ought to be held for his own defaults but not for the acts of the company or the possible defaults of the second contractor. He ought not in reason to be held to a greater or lesser liability according as the railroad sees fit to give the second contractor more or less time to finish.

3. The damages called for are the damages that are sustained, that is, *actually* sustained, by reason of the failure. These it is said, may *include* the excess which the company may pay the new contractor and they may also *include* the amount, if any, due by reason of delay in completion. Under such a provision, damages arbitrarily ascertained have no place.

4. The receiver is not entitled to compensation for the timbers or rings left in the tunnel under a clause of the contract providing that "timber left in the tunnels by order of the engineer will be paid for at the actual cost of the timber," &c., the same being included in the sale to the new contractor comprising "the plant, material and supplies used upon or in connection with its (the original contractor's) works."

5. Upon the receiver's claim for $7,125 for the removal by the original contractor of nine thousand five hundred cubic yards of earth and loose stone from the entrance to the tunnel (being at the rate of seventy-five cents per cubic yard), which in its last estimate of work done by the original contractor or its receiver, the railroad company retained out of the eighty cents per cubic yard payable for the completed job, handing over to the new contractor the whole amount retained—*Held*, that the rights of the parties are determined by subsection 2 of paragraph 35. Under it the company had the right to make a new contract for construction, "*upon such terms as the Company might deem proper,*" and to provide that the new contractor should allow for so much of construction as had been completed, "*a reasonable amount to be prescribed in such new contract.*" Here the original contractor expressly relegated the decision of how much the allowance should be to the judgment and good faith of the railroad and the new contractor.

6. The *reasonable* allowance the new contractor was to make was for *completed* construction. This particular work was incomplete. Besides there is nothing to indicate that the seventy-five cent rate for complete disposal, not of this material alone, but of all undisposed of material, was not on the whole reasonable. It was the very rate stipulated for by the original contractor. As no unfair dealing is pretended, the contracts, as they stand, must decide the matter.

7. The original contractor made an assignment to the First National Bank of Jersey City of any and all sums due and to grow due on account of retained percentages by the railroad under the original contract, "together with all claims for extra work *accruing in connection with said work.*" And by a supplemental contract the contractor for the sum of forty-nine cents per cubic yard, agreed to furnish all labor and materials necessary to complete, to the satisfaction of the chief engineer of the railroad company, the placing of the waste material from the Bergen Hill tunnel on the line of Pennsylvania, New Jersey and New York railroad beyond a distance of one thousand feet from the portal.—*Held*, that work done under this contract, viz., eleven thousand one hundred and fifty-five cubic yards placed beyond the thousand feet, is "extra work" within the meaning of the above assignment, it appearing that the earth and rock so placed were taken from the section of the tunnel the original contractor was engaged in excavating under the original contract.

*Mr. Chauncey G. Parker*, for the receiver.

*Mr. Albert Wall*, for the Pennsylvania, New Jersey and New York Railroad Company.

*Mr. William D. Edwards*, for the First National Bank of Jersey City.

STEVENS, V. C.

The questions here considered come up on the petition of the receiver of the John Shields Construction Company for instructions. Among other things, he asks that the Pennsylvania, New Jersey and New York Railroad Company be directed to pay certain claims. The company resists their payment and insists that it has a claim against the receiver for liquidated damages.

On March 16th, 1905, the railroad company entered into an agreement with the construction company for the construction of the westerly section of the Weehawken tunnel. After the latter had done a certain portion of the work it became insolvent, and on December 29th, 1905, a receiver was appointed. The receiver continued the work until January 21st, 1906, and then stopped. On March 2d, 1906, the railroad made a new contract with William Bradley, who completed it. I will first consider the question of liquidated damages.

Section 34 of the Shields contract provides as follows:

"In case the contractor shall fail to complete the work hereunder in accordance with the specifications and to the satisfaction of the engineer within the time herein agreed upon, the contractor shall and will pay to the Company a sum equal to 1/50 of one per cent. of the amount paid or to be paid him for the entire work for each and every day the time consumed on said work and completion may exceed the time herein allowed for that purpose, which said sum, in view of the difficulty of · ascertaining the loss which the Company will suffer by reason of delay in the performance of the work hereunder, is hereby agreed upon, fixed and determined by the parties hereto as the liquidated damages that the Company will suffer by reason of said delay and default and not as penalty, and the Company shall and may deduct and retain the amount of such liquidated damages out of the moneys which may be due or become due to the contractor under this agreement."

Section 35 (under which the railroad company proceeded) provides that if the engineer shall certify that in his opinion sufficient plant and material and a sufficient number of workmen are not employed in the execution of the work or that the work is not being carried on with due diligence, the company may give the contractor written notice, and if the contractor shall not comply with its directions the company may do one of two things—either (1) declare the contractor to be

19

in default and forthwith procure by contract or otherwise, either for the contractor, for his account and at his risk or otherwise as the company shall determine, the completion of the work, or (2) declare the contract at an end.

As the railroad company elected to take the latter alternative, and as the decision hinges upon the meaning of this subsection, I give it in full (the italics being mine) :

"2. Declare this contract at an end, except as to liability of the contractor, hereinafter in this paragraph provided, and *may make a new contract* for construction with other parties *upon such terms as the Company may deem proper;* the same to provide among other things that the new contractor shall allow, for so much of construction as has been already completed, a reasonable amount to be prescribed in such new contract, or to be ascertained as in such new contract to be provided; and in such case the contractor shall pay the Company for all damages which the Company shall sustain by reason of such failure, *including* the excess, if any, of the amount which the Company shall pay the new contractor over the amount it would have had to pay the contractor party hereto for the same work and materials, *together with the amount, if any, which shall be due the Company, by reason of the delay in completion of the construction* and completion of the entire work."

The new contractor performed the work at the same rates the Shields company had contracted for, and, as far as appears, no damage in fact resulted from delay in construction, inasmuch as the other sections of the work had not been finished. The claim, therefore, is not based upon any real injury suffered. If the railroad is entitled to liquidated damages (which, it is said, amount to about $50,000, calculated according to section 34), it is merely because the contract so provides.

It seems to me plain that the contract does not provide for liquidated damages in the event that has happened. I have recently considered the question in the unreported case of *Commonwealth Roofing Co.* v. *Board of Education of the City of Newark* —a case involving a similar situation—and I see no reason for changing my views on the subject. There are in the paragraphs quoted two alternatives presented—*first,* the completion of the work by the original contractor, but not within the time specified. Such was the case of *Flynn* v. *Jersey City, 74 N. J. Eq. (4 Buch.) 107; 76 N. J. Eq. (6 Buch.) 607; second,* the comple-

tion of the work by the railroad company or a second contractor. Every line of paragraph 34 indicates that the case there provided for is that of the original contractor who fails to complete *within the time agreed upon.* The assumption is that such contractor is doing the work, up to the very time of completion, and that it is *his* delay which is. causing the loss. In that event the company is authorized to deduct and retain from the contract price, stipulated to be paid to him, the liquidated damages, calculated as section 34 provides.

Under subsection 2 of section 35, on the other hand, provision is made for the possible loss that may ensue, where the company has been obliged to do the work itself or to employ and pay a second contractor. Here the conditions are different.. The first contractor ought to be held for his own defaults, but not for the acts of the company or the possible defaults of the second contractor. He ought not in reason to be held to a greater or lesser liability according as the railroad sees fit to give the second contractor more or less time to finish. The dealings of the company with Bradley illustrate this point. By the first contract, he was to finish by July 1st, 1907; then the time for completion was extended to June 30th, 1908, and afterwards to December 31st, 1908. The company claims damages, calculated only from March 7th, 1907, up to July 1st, 1907, but why not up to December 31st, 1908, if in view of the situation or difficulties encountered it thought *that* a reasonable time? The question comes to this, does the contract allow the company to determine the amount of liquidated damages on considerations aside from the defaults of the Shields company? Subsection 2 seems to me to call for another way of estimating them—a way that accords with established rules. It provides, first, that the second contractor shall allow a reasonable amount for the work done by the first contractor; second, that if damage be sustained by the company by reason of the first contractor's failure to complete, such contractor shall pay it; and, that there may be no controversy as to what shall be considered damages, it is declared that they shall include the excess, if any, which the company shall pay the new contractor over the amount it would have had to pay the old,

"together with the amount, if any, which shall be due the Company by reason of the delay in completion of the construction and completing of the entire work."

If by this last clause it had been intended to fix in advance an arbitrary sum, dependent for its amount upon the acts or defaults of persons other than the first contractor, it would have been easy to refer to section 34 as giving the rule for its ascertainment. The question would then have arisen whether such a sum, so fixed, could, under the authorities, be other than a penalty. But there is nothing that requires a construction so ill adapted to the situation. The damages called for are the damages that are sustained—that is, *actually* sustained, by reason of the failure. These, it is said, may *include* the excess which the company may pay the new contractor. and they may also *include* the amount, if any, due by reason of delay in completion. Under such a provision, damages arbitrarily ascertained have no place.

I will next consider the claim of the receiver to compensation for the timbers or rings left in the tunnel. The contract provides that "timber left in the tunnels by order of the engineer will be paid for at the actual cost of the timber," &c. The receiver contends that when the engineer permitted Bradley to lay concrete upon and around these timbers, instead of requiring him to remove them, they were left in the tunnel, at least, impliedly, by order of the engineer. The contention rests upon the misapprehension that they belonged to the receiver. The fact is that they were included in the sale to Bradley of "the plant, material and supplies used upon or in connection with its (the Shields construction company's) works." If anybody has any claim, it is Bradley.

A more perplexing question relates to the receiver's claim for $7,125 for the removal by the Shields company of nine thousand five hundred cubic yards of earth and loose stone from the entrance to the tunnel. This was dirt and not rock excavation. Under the Shields contract the company had the right, subject to the approval of the engineer, of adopting one of two methods of doing the work. He might either tunnel through the earth or resort to the so-called "cut and cover" method—that is, he might make an open cut, and then after the portal had been built, throw

back the earth upon the masonry of the tunnel roof. The option was thus provided for in paragraph 287 of the specifications:

"287. In the construction of the tunnels from the west face of Bergen Hill and adjoining portals, the contractor, should he consider it to his advantage, may construct such lengths of the tunnels by cut and cover work (subject to the approval of the engineer). This cut and cover work will be paid for at the rates quoted in the schedule for Bergen Hill tunnels, irrespective of methods of construction."

Under the title "Hackensack Portal and Approach," excavation is allowed at the so-called unit price of eighty cents per cubic yard.

For doing the work in either of the methods above indicated, the contractor was, therefore, entitled to eighty cents per cubic yard, and no more. The Shields company adopted the "cut and cover" method. It placed the earth and stone taken out on a spot near the site of the portal on the higher ground, intending, subsequently, to throw it back upon the masonry; but it became insolvent before it had done this. Consequently, Bradley, the new contractor, did it. In its last estimate of work done by the Shields company or its receiver the railroad company retained seventy-five cents out of the eighty cents payable for the completed job.

The evidence is that the cost of original excavation, and the cost of "back fill," are about the same, and so, had the contract not otherwise provided, it would have seemed fair for the Shields company and Bradley to have divided the price between them. Such a division would have accorded with the evidence of the witnesses for the receiver as to the value of this particular work. Carley & Cutley say the reasonable cost of throwing back the dirt and stone was from thirty to thirty-five cents a yard, and Van Keuren says from forty to forty-five cents. On the other hand, Forgie, the railroad engineer, testifies that the actual cost was $4,299, or forty-five cents per cubic yard, to which he would add for depreciation and profit one-third more, making a total of sixty cents.

What the railroad actually did was to hand over to Bradley the whole of the amount retained.

Its right to do so is sought to be justified, first, upon the ground that the sum paid Bradley was a reasonable allowance; but even on Mr. Forgie's estimate, it seems to have been excessive, and secondly, upon the ground of contract obligation.

In section 22 of the Shields contract is the following clause:

"(h) If the Company so elect, it may upon giving the contractor ten days' written notice require the contractor to effect the complete disposal of all excavated materials or any part thereof, paying therefor at the rate of seventy-five cents per cubic yard, measured as hereinbefore provided for measurements of excavation."

This clause is also incorporated in the Bradley contract.

As appears in my discussion of the question of liquidated damages, the railroad company had the right to give the contractor notice to provide additional machinery and workmen, and on his failure to do so, either to proceed with the work on its (the contractor's) account or declare the contract at an end. As the railroad adopted the latter alternative, here, too, the right of the parties is determined by subsection 2 of paragraph 35. Under it the company had the right to make a new contract for construction, "upon such terms as the company might deem proper," and to provide that the new contractor should allow for so much of construction as had been completed, "a reasonable amount to be prescribed in such new contract." Here the Shields company expressly relegated the decision of how much the allowance should be to the judgment and good faith of the railroad and the new contractor.

In the case in hand, no sum by way of allowance was expressly named in the Bradley contract, but as Bradley was to complete at the figures contracted for by the Shields company, a method of ascertainment was indicated.

I am strongly inclined to think that even if the railroad's engineer did not have in mind subsection 8 of paragraph 20 (i. e., the clause requiring complete disposal of excavated material) when he made the deduction of seventy-five cents, Bradley could, under this clause, have insisted, as against the railroad, that if he had completely disposed of the excavated material in question by putting it on the tunnel roof, he was entitled to the seventy-five-

cent rate. I cannot find any other rate applicable to the situation; and the clause in question is in terms at least broad enough to include it. It does not follow that because the Shields company could not have claimed under this clause, therefore Bradley could not. Their situation in this regard was quite different. The Shields company, under the option given, had, presumably, because it thought it to its advantage, adopted the cut and cover method, for which it was to receive the stipulated eighty cents. Bradley had no option in the matter. Here was certain excavated material lying near the tunnel mouth, which he was obliged to dispose of, if the railroad so required, unless it was altogether outside of his contract. But with a clause fitting the situation as completely as subsection *"h,"* does, I do not see how it could be so considered. Counsel for the receiver would limit its application to the *waste* material referred to in sections 304 to 307 of the specifications; but 307 is narrower than subsection *"h."*

Section 307 refers in express terms to subsection 22*h,* and this latter omits, and, as we must suppose, designedly, all reference to waste. If Bradley's work was done under this clause, then the payment was such as the company was in law compellable to make him. If made, it had the right to deduct it from the balance due the receiver.

The *reasonable* allowance the new contractor was to make was for *completed* construction. This particular work was incomplete. Besides there is nothing to indicate that the seventy-five cent rate for complete disposal, not of this material alone, but of all undisposed of material, was not on the whole reasonable. It was the very rate stipulated for by the Shields company. As no unfair dealing is pretended, the contracts, as they stand, must decide the matter.

On October 5th, 1905, the construction company made an assignment to the First National Bank of Jersey City of any and all sums due and to grow due on account of retained percentages by the railroad under the before-mentioned contract of March 16th, 1905, "together with all claims for extra work *accruing in connection with said work."*

On December 12th, 1905, by a supplemental contract, the construction company, for the sum of forty-nine cents per cubic yard,

agreed to furnish all labor and materials necessary to complete, to the satisfaction of the chief engineer of the railroad company, "the placing of the waste material from the Bergen Hill tunnel on the line of Pennsylvania, New Jersey and New York railroad beyond a distance of one thousand feet from the portal."

The question as between the receiver and the bank is whether the work done under this contract (viz., eleven thousand one hundred and fifty-five cubic yards placed beyond the thousand feet) is extra work within the meaning of the above assignment. As I understand, the earth and rock so placed were taken from the section of the tunnel the construction company was engaged in excavating under the contract of March 16th, 1905. If so, I think it was "extra work accruing in connection with" the work under that contract. Had the material not come from the part of the tunnel which the company was engaged in excavating, its removal would not have given rise to a claim that accrued in connection with the work, but it was taken therefrom, and all that happened was that it was transported by the construction company a little further than it would have been under the contract as first made. The fact that the terms of the contract were broad enough to include other work done elsewhere, which might not have been extra work, does not alter the character of *this* work.