12947

NATIONAL LOAN & EXCHANGE BANK OF GREENWOOD v. GUSTAFSON *ET AL.*

(154 S. E., 167)

228

234

238

241

242

*Messrs. Haynesworth & Haynesworth* for National Surety Co., appellant,

*Mr. J. B. Park* for School District No. 18, respondent,

*Messrs. F. B. Grier* and *M. G. McDonald* for National Loan & Exchange Bank of Greenwood and, *W. H. Nicholson* for the architects.

July 11, 1930.

The opinion of the Court was delivered by MR. CHIEF JUSTICE WATTS.

For the reasons assigned by his Honor, Judge Dennis, it is the judgment of this Court that the judgment be affirmed.

MR. JUSTICE BLEASE concurs in result.

MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting): This action was commenced in September, 1926, by the National Loan & Exchange Bank of Greenwood, S. C., upon a note for $12,000.00, executed to it by the defendant Gustafson, dated April 5, 1926, due May 10, 1926, with interest and attorney's fees. The plaintiff seeks a recovery of judgment against the defendant Gustafson, as maker of the note, and against the National Surety Company upon grounds which will later be explained. School District No. 18 of Greenwood County was made a party defendant to the cause, and relief was prayed against it, that it be enjoined from disbursing, paying out, or otherwise disposing of the money due or to become due upon the contract hereinafter referred to, and that the plaintiff bank be decreed to have a lien upon such money.

The surety company answered denying its liability on the note and the right of the bank to the lien claimed.

The school district answered, taking no part in the controversy between the bank and the surety company, but demanding that the full amount of the bond be paid into Court by the surety company, and that it be distributed to the creditors of Gustafson, to the relief of the school district. It does not appear that this answer was served upon the surety company or that there was a reply thereto.

Two principal controversies are involved in the appeal—one between the plaintiff bank and the surety company, and the other between the surety company and the school district.

The controversy between the bank and the surety company is whether the bank is entitled to recover from the surety company the amount of a note for $12,000.00, with interest and attorney's fees, which was made by the contractor to the bank for money advanced for the construction of the building, on the faith of an assignment by the contractor of the estimates to be issued by the architect.

The controversy between the surety company and the school district is whether the latter has the right, out of the funds remaining in its hands, to deduct the sum of$4,950.00 as liquidated damages for delay in the construction of the work.

The facts out of which both controversies arise, that is, the facts common to both, are these:

On June 23, 1925, Gustafson entered into a contract with the school district for the construction of a high school building and auditorium for $151,810.00 to be paid as follows: By the 10th of each month 85 per cent of the labor and materials incorporated in the work up to the first of that month upon estimates of the architect; upon substantial compliance 10 per cent more; and upon full completion the balance.

On July 1, 1925, Gustafson applied to the defendant, National Surety Company, for a bond to be issued on account of said contract; the bond was to be in the sum of $51,805.00 to guarantee the faithful performance of the contract.

In paragraph 6 of the application it was provided: "That in further consideration of the execution of said bond, the undersigned hereby assigns, transfers and conveys to the company (surety) all the deferred payments and retained percentages, and any and all moneys and properties that may be due and payable to the undersigned at the time of any breach or default in said contract, or that thereafter may become due and payable to the undersigned or on account of said contract or on account of extra work or materials supplied in connection therewith, hereby agreeing

that such money, and the proceeds of such payments and properties shall *be the sole property* of the company and to be by it credited upon any loss, cost, damage, charge and expense sustained or incurred by it under said bond."

The application further declared that the contractor had arranged a line of credit with the American Bank & Trust Company, for the purpose of handling the contract up to $15,000.00, which the contractor proposed to secure by an assignment of estimates, *for temporary purposes only*.

On July 11, 1925, the National Surety Company issued the bond in question, conditioned that the principal should faithfully perform the contract on his part, and satisfy all claims and demands incurred for the same, and should fully indemnify and save harmless the owner from all cost and damage which it might suffer by reason of *failure so to do,* and should fully reimburse and repay the owner all outlay and expense which the owner might incur in making good any such default, and should pay all persons who have contracts directly with the principal for labor or materials.

Thereafter the American Bank & Trust Company furnished money to the contractor from time to time, but later refused to make further advances, and the contractor negotiated a line of credit with the plaintiff, National Loan & Exchange Bank of Greenwood, up to $12,000.00, and from time to time drew money from it upon monthly notes. This arrangement was made about September 1, 1925.

On September 8, 1925, to secure the line of credit, the contractor executed the following assignment: "For value received I hereby set over and assign to National Loan & Exchange Bank of Greenwood, all my right title and interest in estimates and percentage held back on Greenwood high school building and due me by School District No. 18 between the first and tenth of October, 1925. And also all following estimates so long as we are indebted to said bank."

The note originally executed was paid, and no other assignment was executed. The contractor then undertook the construction.

In April or May, 1926, the architect became dissatisfied with the progress that was being made by Gustafson, and so reported to the trustees of the school district. They held a meeting on May 15th, which was attended by Wilson, the architect, and Maher, representative of the surety company. The trustees then decided to take over the work and complete the building. They accordingly gave notice to those persons who were supplying material that they would not be responsible for debts already incurred, but would be responsible for all material thereafter furnished. They continued in charge and control of the work, which was supervised by a superintendent, Casper, selected by the architect.

After this meeting, Maher, representative of the surety company, went to Florida, whither Gustafson had gone and was at work, and on May 20th he and Gustafson appeared before the trustees and asked that Gustafson be allowed to continue and complete the work. The trustees agreed to this request, and thereafter paid to Gustafson three estimates:

| | |
|---|---|
| May 20 | $7,855.00 |
| June 7 | 7,667.70 |
| July 10 | 6,543.86 |
| Total | $22,066.56 |

It appears that, during the progress of the work, resumed by Gustafson, Maher was energetically employed in supervising the work and expenditures of Gustafson under the same superintendent, Casper, and required for a time a part of the money paid to Gustafson to be deposited in a Columbia bank, subject to the joint check of Gustafson and Murphy, attorney for the surety company.

The progress of the work was still unsatisfactory, and on August 19th the trustees gave notice that on September 1st they would terminate the then existing arrangement, and

take over the work themselves for completion. This was done, and the work was completed by December 3d.

Under a consent order of his Honor, Judge Sease, dated November 12, 1926, after practical completion of the work, the surety company paid claims for labor and material, incurred prior to September 1st, amounting to more than $30,000, independently of the May, June and July estimates.

The case was referred to the Master for the purpose of taking the testimony. It came on for trial before his Honor, Judge Dennis, who filed a decree dated May 8, 1928, sustaining the contention of the bank, and deciding in favor of the school district upon its claim of liquidated damages on account of delay. The surety company has appealed.

1. *As to the Controversy between the Bank and the Surety Company.*—The contention of the bank that the surety company is liable to it upon the $12,000.00 note which Gustafson gave to it for money borrowed appears to be based upon two grounds: (1) That the funds were advanced by it to Gustafson and actually used by him in the purchase of material and in payment of labor claims used and employed in the construction of the building; (2) that by the assignment of September 8, 1925, by Gustafson to it of the estimates and percentages, the bank held the prior claim upon them; and that, by the arrangement between the trustees of the school district, Gustafson and the surety company, by which the estimates of May, June, and July, 1926, amounting to $22,066.56, were turned over to Gustafson and diverted to the payment of claims for material and labor, instead of being applied to the note of the bank, the surety company, which received the benefit of that diversion, is liable to the bank to the extent of the note, $12,000.00, with interest and attorney's fees.

As to the first ground of the bank's contention, I do not think that there is a possibility of sustaining it.

The condition of the bond is: "That if the principal shall faithfully perform the contract on his part and satisfy all

claims and demands incurred for the same, and shall fully indemnify and save harmless the owner from all costs and damages which he may suffer by reason of failure so to do, and shall fully reimburse and repay the owner all outlays and expenses which the owner may incur in making good any such default, and shall pay all persons who have contracts directly with the principal for labor or materials, then this obligation shall be null and void, otherwise it shall remain in full force and effect."

The plaintiff's position is that this bond covers all debts and obligations *whatsoever* incurred in connection with the contract, including *moneys borrowed* as well as claims for labor and material.

The surety company's position is that the bond is intended: (1) To secure the school district in the performance of the contract and to protect it against loss which it might sustain by reason of the failure of the contractor to perform his contract; (2) to secure payment to all persons supplying the contractor with labor and/or materials—that it does not cover claims on account of moneys borrowed.

The purpose of the parties was: (1) To secure performance of the contract; and (2) to secure payment of claims for labor and material. The primary purpose of the bond is stated in the application, as follows: "The principal object of such bond being to guarantee the performance of a certain contract as hereinafter described."

As stated in *Standard Oil Company v. Powell Paving Company,* 139 S. C., 411, 138 S. E., 184, 186: "The intention of the parties * * * must be derived not only from the condition of the bond but from the contract, specifications, proposal, etc., which are interrelated and must be construed together."

An examination of the terms of the contract in connection with the bond, discloses that it was the intention and purpose of the parties to protect laborers and materialmen,

and to secure completion of the building free from any claims which might be asserted against it.

Article 26 provides: "The contractor shall submit to the architect an application for each payment, and if required, *receipts or other vouchers showing his payments* for materials and labor, including payments for subcontractors, as required by Article 44."

Article 28 is entitled "Payments Withheld," and provides: "The architect may withhold or, on account of subsequently discovered evidence, nullify the whole or part of any certificate for payment to such extent *as may be necessary to protect the owner from loss on account of:* * * * (b) claims filed * * * (c) failure of the contractor to make payments properly to subcontractors or for labor or material," etc.

Article 29: "Neither the final payment nor any part of the retained percentage shall become due until the contractor, if required, shall deliver to| the owner *a complete release of all liens* arising *out of this contract,* or receipts in full in lieu thereof, and, if required in either case, an affidavit that so far as he has knowledge or information the releases and receipts include *all the labor and material for which a lien could be filed.* * * * If any lien or claim remain unsatisfied after all payments are made, the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging such lien or claim.* * * "

It will be observed that the whole purport of these provisions is (1) to protect the owner from loss; (2) to secure completion of the building free from any liens that might be asserted against it; and (3) to protect laborers and materialmen.

*There is no term or provision which discloses any intention to protect those who loan money to the contractor.*

The attorneys for the plaintiff lay great stress on Article 22 of the contract which provides: "The owner shall *have the right* to require the contractor to furnish bond covering

the faithful performance of the contract and the payment of all obligations arising thereunder, etc."

· In the *first* place, plaintiff has evidently read this as, "the owner *shall* require," whereas the language is, "The owner *shall have the right* to require." Obviously there is a difference between, "shall require" and "shall have the right to require." It is not a question as to what bond the owner *might* have required, but is as to the nature of the bond which was actually given and accepted.

In the *second* place, it is apparent from the other provisions of the contract that the nature of the "obligations arising thereunder" for payment of which a bond might be required, were those on account of labor and materials, or which might subject the owner to loss or damage.

The purpose of bonds of this character is to indemnify the owner against loss, and to insure the completion of the building free of liens or claims which might be asserted against it. Bonds of this character given by a contractor are universally construed as having two objects in view: (a) To protect the owner against loss or damage, to insure the completion of the work; and (b) to protect those who furnish labor or material entering into and becoming part of the building.

As stated in *U. S. v. D. L. Taylor & Co.* (D. C.), 268 F., 635, 650: "The purpose of the bond is *primarily* to secure the United States in the performance of the contract, and *secondarily* the payment of all persons supplying the contractor labor and material." See, also, *Dillon Municipal Corporations* (5th Ed.), § 830.

The only claims which could be asserted against the owner are those for which under the general law a lien could be filed, such as claims for labor and material. ·

It is apparent from the wording of the bond (which is of standard form) that the phrase, "satisfy all claims and demands," has reference to those claims only which, if unpaid, would subject the owner to loss, for the bond pro-

ceeds: "And shall fully indemnify and *save harmless* the owner from all costs and damages which he may suffer *by reason of failure so to do.*"

Those persons furnishing labor and material entering into and forming part of the building · have always been given special consideration by the Courts, and in practically all the states they are given by statute a lien: *The same consideration does not extend in favor of those lending money.*

The bond in question is expressly for the protection of laborers and materialmen. But even where a bond does not, in *express terms,* cover such claims, the Courts have leaned to an interpretation which gives protection to laborers and materialmen; *they have never, however, extended this protection to those making loans to the contractor,* even where it is proved that the moneys were used in paying labor and material claims.

In *Standard Oil Company v. Powell Paving Co.,* 139 S. C., 411, 138 S. E., 184, 189, the bond in question was conditioned for the payment of *all claims for labor,* and for the faithful performance of the contract. The question arose whether the bond covered *claims for material* as well as for labor. The Court held that it did; that the city was interested in the protection of both laborers and materialmen, and concerned in the freedom of its public improvements from the cloud of unpaid claims. *But as to the banks which had advanced money for the payment of labor and material,* it was held that they were not entitled to the same consideration, and their claims were postponed to the rights of the surety company, the Court stating:

"If there were any warrant in law for subrogating the bank to the rights of the laborers and materialmen that its funds were used to pay, there would be a different conclusion, but the law is elementary that there can be no subrogation in favor of a volunteer.

" 'It always requires something more than payment of a debt in order to entitle the person paying the same to be

substituted in the place of the original creditor. There must be the discharge of a legal obligation for another who is under a primary obligation, for no man can make another his debtor without his consent, and only a creditor or person under the obligation can invoke the doctrine—there being no debts, there can be no ground for subrogation.' 37 Cyc., 375.

"Furthermore, the bank did not pay debts of the paving company and thus establish even a shadow of claim to subrogation, but it made a loan that the borrower stated was for the payroll (and afterwards testified was so used). It *had* no guaranty that the loan would be so used and no way of enforcing and no interest in requiring such use of it."

This same principle was recognized in the case of *Sumter Trust Co. v. Sumter County,* 136 S. C., 15, 134 S. E., 209, in which it was held that the surety's right to the retained percentages, for the purpose of paying claims for labor and material, was superior to the claim of the bank which had advanced moneys to the contractor.

In the case of *Murchison National Bank v. Clark,* 192 N. C., 403, 135 S. E., 123, 124, the plaintiff bank had loaned money to a contractor for use in carrying on the work of construction of a county building; and sought to recover directly on a bond biven by the contractor. The bond in question provided that it was to insure the faithful performance of the contract "and satisfy all claims and demands incurred for the same" and "fully indemnify and save harmless the owner from all costs and damages which it may suffer by reason of failure so to do." It was held that the plaintiff was not entitled to recover, the Court saying:

"The plaintiff does not come within the class of persons protected by the statute, but it says the language of the bond is broad enough to include its claim, being, as it is, a lender of money to the contractor for use in carrying on the work of construction. * * *

"We do not think the language of the bond, by fair intendment, should be construed to include persons other

than those intended to be protected by the statute. *Smiley v. State,* 60 Ind. App., 507, 110 N. E., 222. The words 'and satisfy all claims and demands incurred for the same' evidently refer to the claims and demands of those who by law are entitled to assert such claims and demands against the owner, or the surety under the statutory bond. *Amer. Sav. B. & T. Co. v. National S. Co.,* 104 Wash., 663, 177 P., 646. Indeed, in one clause of the bond it is sought to limit the claims of laborers and materialmen to such as 'have contracts directly with the principal.' This, of course, would be enlarged by the terms of the statute. *Electric Co. v. Deposit Co., supra* [191 N. C., 653, 132 S. E., 808].

"It is the general holding that a bank furnishing money to a contractor doing public work, for use in paying the claims of laborers and materialmen, without more does not come within the protection of a statutory bond conditioned to pay all persons supplying the principal with labor or materials in the prosecution of his work. *Hardaway v. National Surety Co.,* 211 U. S., 552, 29 S. Ct., 202, 53 L. Ed., 321; *United States for Use of Fidelity Nat. Bank v. Rundle,* 107 F., 227, 46 C. C. A., 251, 52 L. R. A., 505."

It is true that in the case at bar no lien could have been asserted against the building, inasmuch as it is a public building. But it is to be remembered that the bond is of standard form, and is used for individuals and private and public corporations alike; and is to be construed accordingly when used to cover buildings erected for individuals and private corporations, the provision for the payment of all claims for labor and material, protects the owner. When used for the erection of public buildings, this provision affords to those who furnish labor and material protection, which is intended in a measure to be in lieu of the lien which they might otherwise have.

In the case of *National Surety Company v. Hall-Miller Decorating Company,* 104 Miss., 626, 61 S., 700, 702, 46 L. R. A. (N. S.), 325, the Court suggested that as laborers

and materialmen would have no lien upon a public building, the stipulation was intended to protect them, and that "the bond, in a way, supplied the place of the mechanic's lien law, and thus gave an additional security to all persons working upon this building and supplying material therefor."

In *U. S. v. National Surety Company* (C. C. A.), 92 F., 549, 551, which was a suit brought on a bond given by a contractor. the Court stated that the bond was intended to perform a. double function: in the first place to secure to the government the faithful performance of all obligations which the contractor might assume towards it, and in the second place to protect third persons furnishing materials and labor. Continuing, the Court said: "The two agreements which the bond contains, the one for the benefit of the government and the one for the benefit of third persons, are as distinct as if they were contained in separate instruments, the government's name being used as obligee in the latter agreement merely as a matter of convenience."

"Through considerations of public policy the law has made no provision by lien or otherwise for the protection of the laborers and materialmen for labor employed or material used in improving the public streets. But it cannot be denied that the same equity exists, and that the same moral obligation rests upon. the city to protect those who improve its streets as rest upon those making private improvements." *Fed. S. Co. v. Minneapolis S. & M. Co.* (C. C. A.), 17 F. (2d.), 242, 244.

In the case of *Smith v. Bowman,* 32 Utah, 33, 88 P., 687, 688, 9 L. R. A. (N. S.), 889, the Court had under consideration a bond for the completion of a State College building which was conditioned that the contractor shall "keep and perform the covenants," etc., and "shall duly and promptly pay and discharge all indebtedness that may be incurred by the said Bowman, Hodder & Co. [the contractor], in carrying out the said contract, and complete the same, free of all mechanics' liens." Although in one

clause it was stipulated that all indebtedness incurred by the contractor should be paid, the Court held that the bond did not bind the surety to discharge all indebtedness contracted in the erection of the building, but only those claims which might otherwise have been filed as liens. The Court said: "By the expression 'shall pay and discharge all indebtedness incurred in carrying out the contract, the parties clearly meant the indebtedness of claims which could be asserted against the college and for which liens could be filed."

Claims for labor and material entering into the construction of a building are comparatively easy of verification. But money has no earmarks, and is usually mingled with the other funds of the contractor. It would be practically impossible for a surety to trace borrowed money and show the objects to which it was actually applied. If the Courts were to construe bonds of this character as providing for the payment of *all debts* contracted in the construction of the building, it would open wide the door for fraud and imposition, and a surety might be made liable for large sums of money which had not been used for the building. On the other hand, it is comparatively easy to ascertain what labor and what materials entered into the work of construction.

As to the second ground above stated of the bank's contention that the surety company should pay the $12,000.00 note, which for convenience I will reproduce here: That by the assignment of September 8, 1925, by Gustafson to it of the estimates and percentages, the bank held the prior claim upon them, and that by the arrangement between the trustees of the school district, Gustafson, and the surety company, by which the estimates of May, June and July, 1926, amounting to $22,066.56, were turned over to Gustafson and diverted to the payment of claims for material and labor, instead of being applied to the note of the bank, the surety company, which received the benefit of that diver-

sion, is liable to the bank to the extent of the note, $12,000.-00, with interest and attorney's fees.

It does not distinctly so appear, but I assume that the estimates from October, 1925, to April, 1926, inclusive, were applied by Gustafson to his running obligations to the bank evidenced by monthly renewal notes, and that in April the note in suit was given, the bank relying upon the assignment above quoted made in September, 1925; under it the bank claims the prior right to the estimates in question of May, June, and July.

The solidity of this ground depends upon the primary essential that the bank held an assignment of these estimates and percentages prior in law and in equity, to the assignment which the surety company held, either by an actual assignment or under the principle of subrogation; the secondary contention, that by arrangement between the trustees, the surety company, and Gustafson, the estimates of May, June, and July were wrongfully diverted, necessarily depends upon the validity of the plaintiff's claim to a prior right to these estimates.

The plaintiff claims priority under the assignment by Gustafson, dated September 8, 1925, three days after the date of the first $12,000.00 note, September 5, 1925, set forth above.

The surety company claims under the assignment made by Gustafson, contained in his application for a bond, set forth above, and under its equitable right of subrogation by reason of its payment of claims for material and labor, far in excess of the May, June, and July estimates, and of the balance on hand with the trustees.

I am inclined to think that his Honor, the Circuit Judge, was correct in holding that, so far as the estimates of May, June, and July are concerned, the assignment to the surety company did not cover them, as by its terms it did not become operative until there was a default by the contractor. This objection, however, could not apply to the balance

due upon the contract at the time of default subject to what the trustees had to pay out in the completion of the construction.

I think, however, that it is clear that in May, 1926, the trustees had the right to withhold from Gustafson, and therefore from the bank which claimed under him, all of the funds in their hands, and to apply them to expenses connected with the completion of the contract and to the payment of the claims for material and labor, and that the surety company, by virtue of its relation as surety, had the right to insist upon such withholding and application by the trustees. If the trustees had such right of withholding and application and the surety company had the right to insist upon it, the bank of course took its assignment subject to such right.

On May 15, 1926, the unpaid balance in the hands of the trustees was $41,181.42. From May 20th to July 20th, the work was being managed by Casper, a superintendent selected by the architect with Gustafson's consent. During this period the trustees paid to Gustafson the aggregate sum of $22,066.56. This money was deposited in the bank in Gustafson's name, was paid out on his checks, O. K.'d by the agent of the surety company, and applied through Casper to the payment of current bills for labor and material. There is absolutely no evidence to show that any part of this fund was used for any other purpose.

The trustees, on taking over the work, completed it and paid the cost out of the balance in their hands. After making these payments, they claim that the unpaid balance in their hands is only $3,174.80. But there were outstanding unpaid claims for labor and material aggregating over $30,000.00, and all of these claims, since the commencement of the suit, have been paid by the surety company out of its own funds.

The following language, taken from opinion of the Circuit Court of Appeals for the Fourth Circuit, written by Judge Parker, is an exceedingly clear statement of the rel-

ative rights of the parties, to-wit: "Now the obligee, upon default of the principal, is without doubt entitled to apply all moneys unpaid towards the performance of the contract, ignoring any assignments by the principal; and it necessarily follows that the surety upon performing the contract, being subrogated to the rights of the obligee, is entitled to the moneys unpaid so far as necessary to reimburse his loss. If the surety, instead of performing the contract, elects to pay damages, it can be held for no more than the amount which the obligee in compelled to pay to complete the work over and above the amount which it has on hand at the time of the principal's default, for this is all the damage that the surety sustains. But when this happens the surety receives the benefit of the unpaid current estimates as well as the retained percentages." *Lacy v. Maryland Casualty Co.* (C. C. A.), 32 F. (2d), 48, 51.

It will be remembered that the testimony shows that on May 15th, Gustafson had virtually abandoned the work, and the trustees had taken over the contract, notifying all materialmen that they would be responsible for material thereafter furnished. On May 20th the trustees, at the request of Gustafson and the agent of the surety company, consented that the work might be continued under Casper, the superintendent; and it was under this arrangement that the three payments aggregating $22,066.56, were made by the trustees, and applied to current bills for labor and material. Certainly the trustees had the right to have the work continued in this way and to apply this money to the payment of these bills, and the surety company, by reason of its contract, had the right to insist that this should be done. The right of the bank under its assignment was subordinate to the rights of both the trustees and the surety company.

The contractor was insolvent, had virtually abandoned his contract, and was unable to proceed and pay for the work, except out of moneys to be advanced by the trustees.

The contract expressly provided that the trustees might withhold any certificates for payment to such an extent as might be necessary for the protection of the owner from loss (1) from claims fiied, or likely to be filed; (2) from the failure of the contractor to pay for labor and material; and (3) from a reasonable doubt that the contract could be completed for the unpaid balance.

In the condition in which the contractor stood on May 20th, the trustees had the clear right to withhold all payments, and require that all moneys thereafter paid be applied towards the carrying forward of the work and for the payment of current bills for labor and material; and the surety company would have been clearly within its rights in asking that this course be followed. The bank, as assignee of Gustafson, could claim only such rights in the unpaid balance as Gustafson had.

Evidently, with the view of preventing any claim which would interfere with the rights of the owner, the contract expressly provided that the contractor should not "assign any moneys due or to become due him hereunder without the previous written consent of the owner."

The surety company, under the established principles of law, had the right to the protection which the trustees possessed under the terms of the contract. All of its protective provisions inured to the benefit of the surety.

This right "of subrogation dated back to the time when the insurance company entered into the contract of suretyship." *Wasco County v. New England Eq. Ins. Co.*, 88 Or., 465, 172 P., 126, L. R. A., 1918-D, 732, Ann. Cas., 1918-E, 656. This right accorded by law to the surety is superior to that of any assignee of the contractor.

The contract expressly provides that the contractor shall not "assign any moneys due or to become due to him hereunder, without the previous written consent of the owner;" and it is admitted that the owner gave no such consent.

In view of this provision and of the rights of the surety, it is safe to say that the trustees, against the objection of the surety, could not have given their consent to any such assignment. And it is quite certain that any such assignment made without the consent of the trustees would, under the terms of the contract and the principles of law, be subordinate to the rights of the trustees and of the surety company.

Any one taking an assignment from the contractor of moneys to become due under the terms of the contract would necessarily be charged with notice of the conditions contained in the contract. He could not claim under the terms of the contract without being governed by these terms. His assignment necessarily would have reference to these terms and would advise the assignee that in taking the assignment he would stand in the shoes of the contractor. This proposition has been clearly established in this State, as we shall hereafter see.

In addition to the rights, which the surety company had under the law, the contract expressly stipulated as follows: "That in further consideration of the execution of said bond the undersigned *hereby assigns, transfers and conveys to the company all the deferred payments and retained percentages;* and any and all moneys and properties that may be due and payable to the undersigned at the time of any breach or default in said contract, or that thereafter may become due and payable to the undersigned on account of said contract or on account of extra work or material supplied in connection therewith, *hereby agreeing that such money and the proceeds of such payments and properties shall be the sole property of the company and to be by it credited upon any loss, cost, damage, charge and expense,* sustained or incurred by it under said bond."

The clear and unambiguous meaning of the language employed is that this is a *present* assignment of "all the deferred payments and retained percentages," and the further

assignment of any moneys which may be due and payable to the contractor at the time of any breach or default in the contract.

The bank, in taking the assignment from the contractor, is charged in law with the knowledge of the terms of the contract and of the fact that its rights were subordinate to those of the owner and the surety company.

The case of *Salt Lake City v. O'Connor,* 68 Utah, 233, 249 P., 810, 814, 49 A. L. R., 941, involved the question as to whether the surety's assignment taken in the application for the bond was entitled to priority over a subsequent assignment to a bank in connection with a loan made to the contractor. The facts, as stated by the Court, are as follows:

"On January 19, 1924, the bank lent $3,000.00 to the contractor upon his promissory note, secured, by his assignment of 'all moneys due or to become due under that certain contract between the undersigned and Salt Lake City, known as Sewer Extension No. 410.' Notice of the assignment was given to the city immediately. The application of the contractor for the bond to the surety, dated in October, 1922, contains a provision to the effect that the contractor assigns, transfers and conveys to the surety all deferred payments and retained percentages, and all moneys to become due to the contractor, at the time of any breach or default in said contract, or that thereafter may become due and payable to the contractor on account of said contract, to be credited by the surety upon any loss sustained by it under the bond."

The Court stated:

"It was contended by the bank that the money it lent to the contractor was used for the payment of labor performed on the work in question. Upon this subject the Court found that the money was loaned to the contractor to enable him to pay for the labor performed on the contract, and that it was paid out for such labor and for other items. This finding is challenged by appellant for lack of evidence to support it. The finding is immaterial. Even if part or all of the money

loaned by the bank was used for paying laborers, that fact would not improve the quality of the bank's claim. * * *

"We conclude that the unpaid contract price remaining in the hands of the city is charged with an equity in favor of the surety, which arose by virture of the retention of the fund by the city and in point of time relates back to the time the contract or suretyship was entered into, and is superior and paramount to any right of the contractor or his assignee.

"*The fund in question being charged with this equity, the assignment to the bank only transfers the contractor's interest therein, subject to the right of the surety.* If the contractor was in person claiming the fund against the surety, no Court would entertain his claim. His assignee has no larger right." *American B. & T. Co. v. Langston* (Ark.), 22 S. W. (2d), 381; *Bank v. Wentz* (C. C. A.), 34 F. (2d), 419; *Fidelity, etc., Co. v. Bank* (D. C.), 21 F. (2d), 102; *Southern Surety Co. v. Holden* (C. C. A.), 14 F. (2d), 411; *Bank v. U. S. F. & G. Co.* (C. C. A.), 9 F. (2d), 326; *Maryland Co. v. Cincinnati* (D. C.), 291 F., 825; *Southern Co. v. Bank* (Ind. App.), 161 N. E., 842; *Fidelity Co. v. Livingston,* 234 Mich., 375, 208 N. W., 446; *Hartford, etc., Co. v. Federal Co.,* 168 Minn., 202, 209 N. W., 911; *Ottumwa Works v. O'Meara* (Iowa), 218 N. W., 920.

The contractor could not by an assignment, *forbidden by the contract,* defeat the right of the owner to withhold payment whenever deemed necessary for its own protection or for the protection of laborers and materialmen. Nor could the contractor by such an assignment defeat the superior rights of laborers and materialmen, or of the surety, whose rights were expressed in law and dated from the execution of the bond.

The note for $12,000.00 made on April 5th, and payable on May 10th, pledged as collateral the "estimates due us on high school building, School District No. 18, together with percentage of 15 per cent. of entire job held back by the trustees."

Neither the trustees nor the surety company were advised of this assignment until May 10th. But even if they had been previously advised of the assignment, there would have been coupled with this knowledge the further knowledge that the assignment itself was subordinate to their rights and to the rights of laborers and materialmen, and this knowledge would likewise have been imputable to the bank.

The fact that, under the conditions which prevailed after May 20th, the estimates were paid to the contractor and disbursed by him for labor and material, and that this was done under the supervision of an agent of the surety company, did not work any change in the rights of the various parties. It was but following a course deemed reasonably necessary under the circumstances, and which was fully authorized by the contract.

In seeing to the application of the unpaid balance to the completion of the contract and to the payment of claims for labor and material, the trustees were clearly within their rights under the plain provisions of the contract. The fact that the surety company, during this critical period, exercised some supervision over the disbursement of the moneys turned over by the trustees, and saw to the application of this money to the payment of current bills for labor and material, in no way altered the rights of any of the parties. The funds were applicable to these purposes, and the surety company, in seeing to the proper application, was acting strictly within its rights.

It is contended, and the Judge so held, that as a result of the conference of May 20th, the surety company took over the contract for the completion of the building, and thereby became bound for the payment of the note held by the bank. Both the premise and the conclusion are unfounded.

The testimony unquestionably shows that the work after May 20th, was continued under the superintendent, Casper, who had been in charge of the work for some time; that he employed the labor, purchased the material, and did other

things necessary to carrying forward the work; that all bills for labor and material were paid by him out of funds advanced by the trustees; these were disbursed personally by Casper; that the activities of the agent of the surety company were confined to the supervision of the disbursement of these funds, so as to see that they were properly applied to the completion of the contract and the payment of claims for labor and material. In doing these things the surety company was acting strictly within its legal rights as surety to the contract, and was following a course which, under the circumstances existing at that time, was necessary for the protection of all parties.

A brief reference to the testimony will clarify this point:

Maher, the agent of the surety company, testified that at the meeting held in May, the architect reported that the work was not progressing and that he (Maher) suggested that, if they were anxious to secure the completion of the building, the board pay the labor and material-men and let the work continue under Mr. Casper, that following this meeting he got in touch with Gustafson, and they appeared before the board on May 20th, and that he (Maher) assured the board that he would give every possible assistance.

Gustafson testified that at the time of the meeting on May 20th, the bills on the job were being paid by the trustees and Casper was in charge of the work; that at this meeting Maher requested the board to resume payment of estimates under the contract and to do away with the agreement whereby the board had been paying labor and material bills. He was asked as to what assurance Maher gave the board about completing the building. To this he replied that Maher told the board that he believed the job could be completed under those conditions without any more hitches; that he could not say that the surety company stated that it would see that the building was completed; that it was his understanding that the job would be completed by the surety

company; that following this meeting he got the estimate and deposited it in the bank.

The account of Wilson, the architect, was as follows: "In the spring, the contractor abandoned the work and left it on our hands and from that time on we had to take over the work until the building was completed." Referring to the meeting with the board of trustees in May, he stated: I think they (the surety company) asked the board to let the work go on under Casper and to arrange for its pay rolls." Again he said that he knew that the surety company requested the trustees to carry on the work by a competent superintendent in charge, and to pay the bills and that he (Wilson) selected the superintendent. Again he stated that at the subsequent meeting with the board they (Gustafson and Maher) requested that the work be continued, and that the board agreed to finance it and arrange to finance the work, and that he thought they agreed that they would see to it being finished, and that they agreed to complete the building and pay all bills.

Mr. Hemphill, the local architect, stated that at this meeting of the board the request was made to continue work under the name of Gustafson Construction Company with the promise that the building would be completed.

Mr. H. L. Watson, the chairman of the board of trustees, testified that at the first meeting Maher requested the adoption of a resolution guaranteeing the payment of bills for labor and material thereafter made, and that, at the request of Maher, the board agreed to take over the building and to pay for material and labor; that at the second meeting of the board they wanted to finish the work in the name of Gustafson Construction Company, "if we would turn over the money in accordance with the original contract, and they assured us that they would go ahead and complete it." He also stated that "If we would go back to the contract the surety company will see that the building was completed." He stated that a resolution of the board had been passed and he

was asked for it, but it was never produced. As to the controversy with the bank, Mr. Watson stated that Mr. Bailey representing the bank protested against the trustees paying the estimate; the trustees stated that they did not want to have anything to do with the dispute between the bank and the surety company; that the trustees were still holding back the 15 per cent. and Bailey claimed a lien on it.

Mr. Baker, a member of the board of trustees, testified "that if we would pay over this claim and let Mr. Gustafson go on with the work, he would see that the building was completed. In other words, he wanted it so the surety company could see where it went and they wanted to have the spending of this money."

It will thus be seen that the testimony utterly fails to establish any definite agreement binding the surety company to take over the actual construction of the work. On the other hand, the work was to be done in Gustafson's name under the direction of his superintendent. The resolution which was adopted by the board and a copy of which was requested by the surety company at the reference was never introduced in evidence. The trustees and the bank evidently preferred to rest upon the recollection of the witnesses rather than upon the written resolution which was actually passed. This testimony, under any fair construction, fails to disclose anything further than that the arrangement of May 20th was that the money should be turned over to Gustafson with the understanding that it would be used for the purpose of carrying forward the work and paying the current bills for labor and material, and with the further understanding that the surety company would see that the money was so applied.

But the surety company was already bound for the completion of the building, and, under its contract as surety, it had the right, in case the contractor should fail to pay the claims for labor and material, to intervene and to see to the proper application of these moneys. The assurance given

by the surety company and the supervision which it thereafter gave were in pursuance of its contract rights as surety upon this contract.

As a matter of fact, the work proceeded under Mr. Casper, the superintendtnt for Gustafson, who had been selected by the architect. It was he who employed the labor, purchased the material, and who paid for labor and material. The estimates were issued in Gustafson's name, deposited in the bank in his name, checked out on checks signed by him, O. K.'d by the agent of the surety company, and the proceeds of the checks were applied by the superintendent to the payment of these bills. In this connection, we refer to a letter from Maher to Casper, under date of July 13th, 1926, which was introduced in evidence by the plaintiff, and which reads as follows: "Mr. Gustafson informs me that he has already confirmed by letter, what he told you verbally, to-wit: that you are in full and complete charge in his absence, with all necessary authority to buy such materials as are needed."

In *Maryland Casualty Company v. Dulaney Lumber Company* (C. C. A.), 23 F. (2d), 378, 380, the contractor became embarrassed during the progress of the work and was unable to pay his bills for labor and material. Thereupon the highway department, under an arrangement made with the surety company, paid two bills which were the subject of controversy, one in May, 1924, for $9,000, out of retained percentages, and the other in September, 1924, for $10,672.92, out of current estimates. Both payments were made at the instance of the surety company, and were deposited to the joint account of itself and of the contractor, and were drawn out in payment of bills for labor and material. The bank had advanced money upon an assignment by the contractor of current estimates. The Court, after referring to the fact that one payment had been made without knowledge of the surety of the bank's assignment, said: "But, aside from these considerations, the bank did not

become entitled, under either assignment, to any funds except such as were payable to the contractor. Labor and material claims were superior to any claim held by the bank. The surety did not appropriate the current estimate in question to its own use, but merely insisted upon a proper application of it. If that estimate had remained in the hands of the highway department, the claims of laborers and material-men, under the public policy that has been established by law in Mississippi, would have been superior to the claim of the bank. The latter could acquire no higher rights than the contractor had. It could not acquire anything of value under the assignment, unless the contract resulted in a profit.

Accordingly, the Court held: "That the bank is not entitled to recover of the surety the amount of the current estimate paid to the contractor, and applied by him and the surety in discharge of bills for labor and material."

But even if the surety company had, in a sense, taken over the completion of the contract, this would not have operated to extend its liability.

In *St. Peter's Catholic Church v. Vannote*, 66 N. J. Eq., 78, 56 A., 1037, 1038, the contractor having abandoned the work, the sureties, with the consent of the owner, undertook its completion. The Court held that in doing this the sureties did not become liable for the indebtedness incurred by the contractor, and were entitled to have the funds remaining in the hands of the owner applied to their reimbursement. The Court said: "Their purpose in undertaking the completion of the building, instead of the owner, is obvious. They, as sureties, were bound to see that the building was completed, and they were concerned to have it done in the most economical manner. To effect that purpose, they wished to have control of the work. The sureties did the work, not for the contractors, nor for the owner, but to relieve themselves as cheaply as possible from their obligation to the owner."

Certainly the allowance of attorneys' fees on the note could in no way be chargeable against the surety company.

Under the conditions which existed on May 20, 1926, the trustees, under the contract, had the right to withhold further payments and to see to the application of the unpaid balance to the completion of the work and to the payment of claims for labor and material; under the arrangements made at the time, this unpaid balance was, in fact, applied to these purposes. The surety company had the right to insist and did insist upon this application. Out of its own funds, it has paid claims for labor and material in excess of $30,000, and, under the law governing contracts of this kind, it has a prior claim upon the balance remaining in the hands of the trustees.

Much reliance is placed by his Honor, Judge Dennis, upon the fact that, in Gustafson's application to the surety company for a bond, he stated that he had arranged a loan with the American Bank and Trust Company to the extent of $15,000, and that the loan was secured by an assignment of estimates. From this it is concluded that the surety company consented to such assignment, and had waived any prior rights which it may have had to the estimates. The statement of the fact of this assignment of estimates as security for a loan is but the statement of a fact, without an agreement to waive the rights of the surety company which were superior to those of the bank. It may well have been considered by the surety company as subject to their rights, particularly as it was stated that the assignments were for temporary use only.

The assignment to the Columbia bank had been made *prior to the application for a bond.* Any representation therefore made by or to the surety company in the application could not possibly have supplied ground for estoppel against the surety company in the shape of an inducement to furnishing the line of credit. The assignment to the plaintiff was made apparently without notice of any representa-

tion contained in the application, and could not have therefore influenced it.

It appears beyond question that all of the funds paid by the trustees to Gustafson between May 20th and July 10th, inclusive, were used in paying for labor and material that went into the building. The supervision of the agent of the surety company was for the purpose of guarding against any diversion of these funds:

| | | |
|---|---:|---:|
| From the balance | | $41,181 42 |
| Deduct the estimates | | 22,066 56 |
| Leaving | | $19,114 86 |
| The architect deducted | | |
| For defects | $1,000 | |
| For material | 2,000 | 3,000 00 |
| | | $16,114 86 |
| Paid out by trustees for completion | | 7,990 06 |
| Leaving | | $ 8,124 80 |
| From this balance the trustees claim the right to deduct as liquidated damages for delay | | 4,950 00 |
| Leaving a balance of | | $ 3,174 80 |

There remained outstanding bills for labor and material aggregating $30,000, all of which the surety company has paid since the commencement of this action under order of Court.

It thus appears that the building has been completed and all of the bills for material and labor have been paid. The question upon this branch of the case is whether the surety company shall pay, in addition to all of the bills for labor and material, the note of Gustafson to the bank, $12,000, with interest from May 10, 1926, and 10 per cent. attorney's

fees, amounting at the present moment to between $17,-000 and $18,000.

*II. As to the controversy between the school trustees and the surety company in reference to the allowance of liquidated damages.*—His Honor, the Circuit Judge, allowed the claim of the trustees for liquidated damages at the rate of $30.00 per day for 165 days from May 23rd to December 3rd.

The surety company contends that it was error to allow damages at that rate after September 1, 1926, the day the trustees took over the building. I think that their contention should be sustained

On September 1st, the trustees took over the contract and took possession of the building. This they had the right to do under the terms of the contract *for the purpose of completing the building and for that purpose alone.*

The authorities unanimously hold that, where a contract provides liquidated damages for delay in the construction of the building and contains another provision authorizing the owner in case of delay to take over the contract and complete it, charging the costs against the contractor, in such case, if the owner elects to take over the contract and complete the building, he will be precluded from claiming the liquidated damages.

It is the general rule that, where the owner elects to take possession of and complete the work himself pursuant to a stipulation contained in the contract, he may not recover the sum stipulated as liquidated damages. *Joint School District v. Bailey-Marsh Co.,* 181 Wis., 202, 194 N. W., 171; *Gilette v. Young,* 45 Colo., 562, 101 P., 766; 9 C. J., 794, § 135; *City of New Haven v. National Steam Co.,* 79 Conn., 482, 65 A., 959.

A provision in a building contract imposing a penalty on the contractor if he fails to finish the work in the time specified does not apply where the owner asserts his right under another provision to take charge of the work and

complete the contract for the contractor's failure to comply with the specifications. *Moore v. Board of Regents for Normal School in District No. 2,* 215 Mo., 705, 115 S. W., 6.

A building contract provision for $15.00 per day liquidated damages for contractor's delay held applicable to delay in completion by the contractor, and not to a case where the contractor abandoned the work and the owner undertook the completion thereof. *Clark v. Fleischmann Vehicle Co.* (Sup.), 187 N. Y. S., 807.

Where a contract for the erection of a building contained a stipulation that, in the event of delay in the completion of the work, the contractor should pay a certain amount per day as liquidated damages, and contained a further provision that in case of default on the part of the contractor, or failure to prosecute the work, the owner might take over the building, and where the owner, under the latter clause, does, before the expiration of the contract, take over the building and completes the work, the stipulation for liquidated damages does not apply. *Fidelity & Deposit Co. v. Robertson,* 136 Ala., 379, 34 So., 933, 944; *Moore v. Board,* 215 Mo., 705, 115 S. W., 6; *Shields v. Shields Const. Co.,* 81 N. J. Eq., 286, 86 A., 958.

"A city which terminates a contract is not entitled, after the date of termination, to any allowance under the liquidated damage provision for delay in the completion of the contract." *Garey v. Pasco* (1916), 89 Wash., 382, 154 P., 433.

For these reasons I think that the decree should be reversed upon both holdings.